**Fred Walking BADGER, formerly known as Fred Delvecchio, Plaintiff-Appellant,**

v.

**Harold J. CARDWELL, Superintendent, Arizona State Prison, Defendant-Appellee.**

No. 76–3703.

United States Court of Appeals, Ninth Circuit.

Oct. 26, 1978.

Rehearing and Rehearing En Banc Denied Dec. 18, 1978.

Victor Aronow (argued), Tempe, Ariz., for plaintiff-appellant.

Galen H. Wilkes, Asst. Atty. Gen. (argued), Phoenix, Ariz., for defendant-appellee.

Before MERRILL and HUFSTEDLER, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge:

The case is before us on appeal from a decision by the district court denying appellant's petition under 28 U.S.C. § 2254 for a writ of habeas corpus. Our jurisdiction stems from 28 U.S.C. §§ 1291 and 1294(1).

## I. FACTS:

In 1972, appellant, Fred Walking Badger,[1] and co-defendant, Jesse Bojorquez, were prisoners in the custody of the State of Arizona at the penitentiary in Florence. They were accused by indictment of assaulting three prison guards on October 8, 1972. In March, 1973, they were brought to trial in state court. Each defendant elected to represent himself, although standby counsel was provided. Their trial lasted six days. Under circumstances which we examine below, appellant was expelled three times and finally barred from further proceedings until the imposition of sentence. On March 14, 1973, the jury returned a verdict of guilty as to both defendants on two counts of assault to commit murder and one count of being prisoners in possession of a weapon. On the basis of this conviction appellant was sentenced to 20 years' imprisonment.

An appeal was taken to the Arizona Supreme Court, which affirmed. *Arizona v. Delvecchio,* 110 Ariz. 396, 519 P.2d 1137 (1974). The petition to the district court followed, alleging principally that appellant had been denied his right to be present during trial.[2] We agree.

## II. DISCUSSION:

■ The right of an accused to be present at his trial is an ancient and well-established one which draws on several constitutional sources. In *Hopt v. People of the Territory of Utah,* 110 U.S. 574, 579, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the Supreme Court held that the due process clause of the Fifth Amendment requires the defendant's attendance at trial. On the same footing, the right was declared applicable to states "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence." *Snyder v. Massachusetts,* 291 U.S. 97, 107–108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934); *Lowery v. Cardwell,* 535 F.2d 546, 549 (9th Cir. 1976). More recently, the Supreme Court has stated that the confrontation clause of the Sixth Amendment guarantees the right of an accused to be present not only whenever testimony is taken, *Snyder, supra,* 291 U.S. at 102, 54 S.Ct. 330, but "in the courtroom at every stage of his trial." *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); *compare Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912). This corollary of his right of confrontation was incorporated into the Fourteenth Amendment and made applicable to the states in *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). *Allen, supra,* 397 U.S. at 338, 90 S.Ct. at 1057;

---

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

1. At the time of the original state court proceeding appellant, a Native American, was named Fred Delvecchio. Subsequently he changed his name to Fred Walking Badger. To avoid confusion we refer to him as "the defendant" or "appellant."

2. Other federal claims on appeal, only one of which we decide, are discussed in footnotes 7 and 9, *infra.*

*Bustamonte v. Eyman,* 456 F.2d 269, 271–273 (9th Cir. 1972).

The right to be present, thus secure, is however not absolute. *Polizzi v. United States,* 550 F.2d 1133, 1137 (9th Cir. 1976). While we would have defendants present at their trials, we must also have those trials fair and conducted in an atmosphere of sufficient calmness and decorum.

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.

*Allen, supra,* 397 U.S. at 343, 90 S.Ct. at 1061. Dictum in *Snyder, supra,* 291 U.S. at 106, 54 S.Ct. at 332, had indicated that "the privilege [of presence] may be lost . . . at times even by misconduct." In *Allen, supra,* the Supreme Court expressly held that

> a defendant can lose his right to be present at trial if, after he has been warned, by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner *so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.* Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings. (Emphasis added.)

397 U.S. at 343, 90 S.Ct. at 1061.

Appellant's absence from the courtroom on March 8, March 13, and March 14 constitutes a *prima facie* denial of his right to be present. Appellee raises, as a defense, acts of misconduct which he alleges waived that right. We must decide whether appellant's behavior at trial did rise to the level of misconduct described in *Allen.* If it did not, we must decide further whether the error of the trial court in excluding appellant was harmless.

A. Was it error to exclude the defendant?

The *Allen* standard is notably couched in general terms. It announces no *per se* rule of excludable conduct. It remits us to a careful examination of the record. But in looking at the unique facts of this case, we must do so in light of *Allen* and its progeny.

In *Allen,* the defendant continued to talk after he had been replaced by appointed counsel, threatened to make a corpse of the judge, threw the papers of his file on the floor, declared that he would prevent any trial whatsoever, and responded to questions with vile and abusive language. The decision of the trial court to exclude him was sustained.

In *United States v. Ives,* 504 F.2d 935 (9th Cir. 1974), the leading case applying *Allen* in this circuit, the defendant refused to answer questions, argued with the judge, struck defense counsel on several occasions, shouted from his cell beneath the courtroom, and physically attacked the United States attorneys. His exclusion was likewise sustained.

Most recently, in *United States v. Kizer,* 569 F.2d 504 (9th Cir. 1978), the defendant interrupted the prosecuting attorney's closing argument, demanded discharge of her attorney and a new trial, and continued to argue with the judge after her motions were denied. This court upheld the order to remove her.

These decisions give some idea of the nature of misconduct which heretofore has justified exclusion of the defendant. They therefore provide a useful comparison for each of the trial court's rulings in the case at hand.

1. *The first expulsion.*

a) Events.

At an appearance on January 11, 1973, two months before trial, appellant interrupted the remarks of other parties several times and changed the subject to inquire of motions he had filed. The trial judge clearly warned him that "unruly or disruptive"

behavior at trial would forfeit his right to conduct his defense and to stay in the courtroom. Tr. Jan. 11, pp. 20, 28, 31.

■ These warnings were forcefully repeated on the first day of trial, March 6, 1973, when it was finally determined that appellant would represent himself.[3] Shortly afterwards, during the selection of jurors, the defendant raised several matters out of turn, and once interrupted the judge as he was talking to him. When he interrupted the judge two more times in quick succession, and insisted that witnesses leave immediately before the jury entered, the court stopped and issued an extended warning that it, not the defendant, would preside in the courtroom. During this warning the defendant interrupted the judge and inquired, "Are you looking for excuses,

Your Honor, to take me out of the court?" The rest of the day passed without further serious incident, although the defendant was variously guilty of interrupting, asking repetitive questions, and arguing his case or with the witnesses. On each occasion he was admonished. Tr. Mar. 6, pp. 3, 4, 9, 10, 68, 71, 76, 125, 129, 133, 180–1, 184, 196.

■ On March 7, the second day of trial, the defendant's participation was limited to cross-examination of prosecution witnesses. From time to time he became argumentative and had to be admonished. On one occasion he entered into an irrelevant dialogue with a witness. Tr. Mar. 7, pp. 24, 46, 63, 68, 74, 77, 115–6, 193.

On March 8, the third day of trial, the court took up several housekeeping matters before calling in the jury for resumption of

---

**3.** Although the question was not raised on appeal, the defendant's handling of his case naturally draws our attention to his waiver of counsel. We express grave doubts whether he was ever sufficiently examined. The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), *citing Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1946); *United States v. Gillings,* 568 F.2d 1307, 1308–1309 (9th Cir. 1978).

When appellant made his first request to represent himself, at his arraignment on December 4, 1972, the following colloquy took place:

MR. DELVECCHIO: Your Honor, we can't be denied the right to represent ourselves.
THE COURT: If the Court makes a determination you can intelligently do so, we will allow you to do so.
MR. DELVECCHIO: And you haven't decided at this point in the trial?
THE COURT: *I don't think it is in your best interests at this time.*
MR. DELVECCHIO: You are denying the request to represent ourselves?
THE COURT: At this time, I am, yes. . .

.      .      .      .      .

MR. DELVECCHIO: When will a determination be made?
THE COURT: *Sometime prior to trial.*
MR. DELVECCHIO: Well, prior to trial we have to establish grounds to fight our defense. And if these lawyers—if we are not going to cooperate with these lawyers, we

are not going to have any defense, Your Honor.
THE COURT: Well, *at this time, I am telling you it is in your best interest to have the service of counsel.* (Emphasis added.)
Tr. Dec. 4, p. 6. Judge McBryde, who was then presiding, thus denied defendant's request *pro tempore* in anticipation that a later judge would make the appropriate inquiry on self-representation.

Appellant renewed his request to represent himself on January 11, 1973. This time Judge Roylston informed him that the court would appoint an attorney whom he could use as he wished. The following exchange took place:
THE COURT: . . . Also, with respect to you, Mr. Bojorquez, if you want Mr. Stokes to represent you, he can represent you in the matter and he will talk further with you and you make the decision whether or not you want the lawyer to represent you or whether you want to conduct your own case. Now it makes no difference to me. But *I will tell you that the trial will run smoother and that you will probably be much better represented if you permit the lawyer to do it.* But I am not telling you nor am I asking you to let the lawyer do it. If you want to represent yourself, you will have the right. But the lawyer will be available.
Now do you understand what I have explained to you, Mr. Delvecchio?
MR. DELVECCHIO: Yes, sir.
THE COURT: Do you understand, Mr. Bojorquez?
MR. BOJORQUEZ: Yes. (Emphasis added.)
Tr. Jan. 11, p. 29. On our record, the preceding passages represent the entire effort by the court to warn the defendant of "the dangers and disadvantages of self-representation."

the testimony. The defendant learned that the witnesses he had planned to call first would not be available until later. The court denied his motion for a continuance until they arrived. Next, copies of proposed instructions were distributed early, to give the parties extra time for study. The court denied the defendant's immediate motion to dispense with instructions, prompting him to complain that "I can't have my trial and my rights at the same time." Thereupon co-defendant Bojorquez moved that new counsel be assigned to him, saying his present attorney had failed to make objections on his behalf. The court denied this request as well and was proceeding to explain the limited role of standby counsel when defendant interrupted to provoke an increasingly heated dialogue.[4] After arguing with the judge, appellant raised a clenched fist, and finally taunted the court to expel him. The court obliged. Tr. Mar. 8, pp. 2–5.

b) Analysis.

In judging whether the preceding events constituted sufficient grounds for concluding that the trial could not have proceeded fairly and efficiently so long as appellant was present in the courtroom, we are mindful that we are engaged, to some extent, in "second guessing." Deference would be owed in any event to the decision of the judge in whose hands the actual responsibility for courtroom conduct is placed. Discretion attends his position. *See Allen, supra,* 397 U.S. at 343, 90 S.Ct. at 1061; *Kizer, supra,* 569 F.2d at 507; *Ives, supra,* 504 F.2d at 942. Still further deference is due in this case, however, because we view the evidence from a cold record.

[T]he appellate court is not in as good a position as the trial judge to determine the effect a defendant's disruptive conduct may have had on the proceedings. Even though facial expressions, gestures and other nonverbal conduct are often tremendously significant, they cannot be transcribed by the court reporter.

*Id.* We must, and do, give great deference to the decision of the trial judge.

We sustain the removal order of March 8. Defendant's behavior was seriously disruptive. Baiting the trial judge to remove him was a direct challenge to the court's authority which left the court little choice in establishing its credibility. The display of a clenched fist, either as a *sign of disrespect* or as a gesture of intimidation, would shatter the courtroom's atmosphere of careful inquiry. These acts transcended the defendant's role as his own attorney. Fair *warning of the consequences of misbehavior* had been given. *Allen, supra,* 397 U.S. at 343, 90 S.Ct. at 1061; *Ives, supra,* 504 F.2d at 942. The appropriate assurance that the defendant could return as soon as he agreed *to conduct himself in an orderly manner* was also extended. *Id.* 397 U.S. at 343, 90 S.Ct. 1057; Tr. Mar. 8, pp. 6, 58. The defendant was therefore properly expelled.

2. *The second expulsion.*

a) Events.

The defendant was returned to the courtroom later the same day, in time to begin the presentation of his case in chief. The court advised him at length to question as a lawyer would, not to argue with witnesses, and, especially, not to interrupt the court or

4. THE COURT: [Your attorney] can't object until he is handling your case for you.
MR. BOJORQUEZ: He is my aide, isn't he?
THE COURT: If you want him to sit there at the table and handle your case.
MR. DELVECCHIO: You appointed him as an aide, Your Honor, didn't you?
THE COURT: Mr. Delvecchio, this is not your problem.
MR. DELVECCHIO: He is tied into my case. I guess he is my problem.
THE COURT: You just sit quiet a minute.
MR. DELVECCHIO: I thought that my—

THE COURT: Either you are going to be quiet or you are going to be taken from the Courtroom. Now it's your choice. The record may show that the defendant Delvecchio is making gestures in the Courtroom by raising a clenched fist. Just keep it up and you will be out.
MR. DELVECCHIO: This is the opportunity that you are looking for, Your Honor.
THE COURT: Show the Court has become unable to control the defendant Delvecchio. It's ordered that he be removed from the Courtroom. Tr. Mar. 8, pp. 4, 5.

to argue with it except on strictly legal matters. The defendant promised to conduct himself in a proper manner. He spent the remainder of the day examining his first two witnesses with only occasional lapses. Tr. Mar. 8, pp. 61–3, 95–6, 122–3.

On March 9, the fourth day of trial, the defendant continued to present his case through the testimony of fellow inmates. While questioning his first witness he once strayed into irrelevant matters; later he interrupted the cross-examination and had to be admonished. Interruptions of the prosecutor continued during cross-examination of the next witness. The second time this happened the court excused the jury and warned appellant, "The next time you will have to go and Mr. Wildermuth [standby counsel] is going to be in your place." The defendant interrupted the court twice during the warning itself. He was allowed to put on his next witness, however, before the court stood in early recess until March 13. Tr. Mar. 9, pp. 19–20, 23, 49–51.

March 13, the fifth day of trial, opened with the examination of Dr. Glenn Walker. Dr. Walker was present as a result of last-minute efforts to obtain an expert who would testify to the effects of tear gas, which had been employed against the defendant during the incident of October 8, 1972. Earlier in the trial, the defendant had apparently been extremely upset to learn that he had missed his opportunity to subpoena witnesses he wanted while he was in prison. Tr. Mar. 6, pp. 67–71, 146–148.

Now he claimed to be disappointed that his witness was not an eye specialist but a general practitioner. That dismay increased when, after some initially favorable testimony, Dr. Walker examined a cartridge of the tear gas used in the prison and declared it to be one of the milder forms. An escalating exchange with the court then took place.[5] To save his argument, the defendant asked that he be shot with tear gas in front of the jury. He interrupted the court when it advised him to ask questions and to defer other matters until the recess, then complained that "[the jury] never hear what's going on." When he continued to argue about the function of the jury, the jury was excused and he was ordered removed from the courtroom. Appellant still objected after this order, and in the end the trial judge was forced to leave the room to end the "tirade." Tr. Mar. 13, pp. 8–9, 12–16.

b) Analysis.

Our review of these events may begin with the observation that there is no difference in kind between the "misconduct" of the defendant after he returned on March 8 until he was expelled on March 13, and his "misconduct" on March 6 and 7. In both periods we are looking at an inartful and inept examiner, occasionally irrelevant, often repetitious, and—most serious—seemingly incapable of letting others finish

5.  Q. This gas you say wouldn't cause any irritating, wouldn't burn the skin?
A.  It would cause some irritation of the skin.
Q.  Would it burn the skin, would it scab a whole body?
A.  No.
Q.  This is your opinion?
A.  That's correct.
MR. DELVECCHIO: Your Honor, I ask that I be put as a demonstration, to be shot with that gas gun at 12 inches from my face, I ask for the jury, that they be allowed to view this.
THE COURT: Just a minute. Just ask questions of the witness, any of these matters—
MR. DELVECCHIO: I ask for me personally, it is not for—
THE COURT: Just a moment, Mr. Delvecchio. Ask questions, that's your job right now.

If you want to take up other matters, that's done at the recess, after the presence of the jury.
MR. DELVECCHIO: They never hear what's going on.
THE COURT: They are not supposed to.
MR. DELVECCHIO: They are supposed to find—
THE COURT: I'll excuse the jury, and ask them to retire from the courtroom for just a minute.
(Whereupon, the jury was then excused from the courtroom.)
THE COURT: Now, I told you on Friday, that the next time you got out of hand, you were going out of the courtroom.
This is not the next time, but you got completely out of line, so I'll ask you to remove Mr. Delvecchio from the courtroom. Tr. Mar. 13, pp. 13–15.

speaking when what they said went against him. But, appellant was not expelled on March 6 or 7.

We find no sign in these proceedings to compare with the earlier baiting and raised fist, or, much less, with the verbal and physical assaults of the defendants in *Allen* and *Ives*, which would indicate an opposition to the concept of a trial itself. Indeed, the evidence of the defendant's attitude runs strongly in the other direction. Before his second expulsion, the defendant had frequently apologized for his errors, Tr. Mar. 6, pp. 120, 177; Tr. Mar. 7, p. 193; Tr. Mar. 6, p. 184; Tr. Mar. 9, pp. 50–51. And the court had agreed that they were not intentional. Tr. Mar. 6, p. 184. Twice the defendant had volunteered to take responsibility for his co-defendant's conduct. Tr. Mar. 6, pp. 131, 168. He had not seized every occasion, although he had seized many, to raise an objection or to insist on his rights. Tr. Mar. 6, pp. 56, 87, 88, 150. When ejected, his vigorous and truthful protestations that he had not been violent show he held a real (if imperfect) vision of conduct befitting an accused, which he had meant to follow. Tr. Mar. 8, pp. 5–6; Tr. Mar. 13, pp. 15, 31. The very fact that the trial had managed to progress for five days is final evidence that appellant was not opposed to the process.

The defendant in *Kizer, supra*, also was guilty simply of interruptions and arguing, yet was removed. That case is distinguishable. There, the defendant was not in the position of representing herself so it was clear that her mere presence would be disruptive. Here, appellant's behavior was exhibited as he was playing the attorney's role. In light of all the evidence, including both the limited nature of his misconduct and the evidence as to his intent, it is impossible to tell if the arguing and the interruptions would have persisted, had that role been withdrawn and assigned to another person.

■ We find error in the second expulsion of the defendant, therefore, even when we accord the trial judge the full measure of deference due his position and superior acquaintance with the facts. We emphasize that we do not hold that the trial court could take no action under the circumstances. We do hold that the action it took was excessive. Where constitutional rights of the accused are at stake, including the right to be present, a trial court must look for corrective measures that do least injury to these rights consistent with the preservation of an orderly court atmosphere.

### 3. *The third expulsion.*

a) Events.

■ The examination of Dr. Walker on the morning of March 13 was completed by appellant's standby counsel. When he had finished appellant was brought back again and warned that he would be sent from the courtroom only so many times. Tr. Mar. 13, pp. 31–33. Appellant then promised to "remain as a proper Indian." *Id.*, p. 33. He was allowed to continue with his case despite interrupting the prosecutor soon afterwards and objecting to a court ruling in a disrespectful manner. *Id.*, pp. 36, 37. With a few exceptions, *id.*, pp. 48, 49, 51, all went well until the examination of Dale Brandfast and Arthur Gomes. These men were respectively the assistant superintendent and superintendent of the Florence prison. Whether by design or by instinct, the defendant sought to use their presence on the stand to try the prison system as a whole, including his treatment thereunder. Consequently he became increasingly argumentative, *id.*, pp. 86, 87, 89, 93–96 and 102, repetitious, *id.*, p. 95, irrelevant, *id.*, pp. 96, 97, and hostile to objections of the prosecution to these traits of his inquiry, *id.*, pp. 85, 90. Having admonished the defendant repeatedly, the court finally excused the jury and warned him not to argue with the witness. In the ensuing conversation appellant refused to give the court a straight answer, interrupted the court as it was advising him, indicated that his own perceived harassment in prison justified the scope of his examination, and in a disrespectful manner agreed to follow the court's instruc-

tions.[6]  At this point the court ordered that he be taken from the courtroom.

### b) Analysis.

These events need not delay us long, for they raise no novel issue.  The later record on March 13 illustrates the same propensities and the same deficiencies that the defendant showed on March 6 and 7 and before his second exit.  Without condoning appellant's behavior in the least, we again find no sign that it was *not* associated with the speaking role he chose to play; hence, that there is no sufficient showing he could not have remained peacefully in the courtroom if relieved of that role.

6.  Q.  Okay.  How many years must one train to become a lieutenant?
A.  [I]f I could be permitted to bring out the specifications, I would read them to you.
THE COURT:  Do you have them with you?
THE WITNESS:  No, I do not.
MR. DELVECCHIO:  I don't need that, because I know in my own mind, the words are creeping on my memory—
THE COURT:  Now, Mr. Delvecchio, just a minute.
I'm going to excuse the jury from the courtroom for about 10 minutes, under the admonitions previously given.
(Whereupon, the jury was then excused from the courtroom.)
THE COURT:  How many times have I warned you this afternoon to just ask questions, Mr. Delvecchio?
Do you have any idea?
MR. DELVECCHIO:  Obviously, I am asking questions.
THE COURT:  You are arguing with the witnesses and we are not going to get anywhere as long as you keep arguing.
I have warned you and warned you about it, and I told you the next time you got out of line—is this going to be your last witness?
MR. DELVECCHIO:  No, it's not.
THE COURT:  How many more witnesses?
MR. DELVECCHIO:  I have some officers yet to call in.
THE COURT:  Well, I'm—if you will agree with me you are going to quit arguing with this witness and only ask questions, I'll permit you to finish examining him; but if you can't agree and abide by that, then, I'm going to have to send you back out of the courtroom.
Are you going to quit arguing with the witness?
MR. DELVECCHIO:  Yes, I am arguing because lies are being stated; that's the only reason that I'm arguing.

### 4.  *The fourth expulsion.*

On the morning of March 14 the defendant was brought back to determine if he wished to testify.  He was not readmitted for the purpose of self-representation.  Assurances of good behavior were neither sought nor extended.  When the defendant did not respond directly to its repeated inquiries, Tr. Mar. 14, pp. 2–6, the court ordered that he be permanently removed until sentencing, *id.*, pp. 6–8, stating that its order was based on the defendant's *past* conduct, *id.*, pp. 7, 8.  Thus, properly considered, the fourth expulsion was but an extension of the third.  The error of the previous day was not only continued, but enhanced.

THE COURT:  Are you going to ask only questions or are you going to keep up this arguing?
MR. DELVECCHIO:  Pardon me, Your Honor?
THE COURT:  Are you going to ask only questions?
MR. DELVECCHIO:  I am going to ask questions that I know in my mind—
THE COURT:  Are these questions that are written out for you?
MR. DELVECCHIO:  I also have written them out.
THE COURT:  There is no reason that Mr. Wildermuth can't read the questions.
MR. DELVECCHIO:  No, because he doesn't know what I intend to prove.
THE COURT:  You can hand him that piece of paper you have there, if it—
MR. DELVECCHIO:  I do not want him to read what I have—
THE COURT:  The thing about it is, I am not going to permit you to harass the witness in the manner you are.
Either you will quit arguing or he's going to take over the case.
MR. DELVECCHIO:  Your Honor, I have been in prison two years and put up with their harassment.
THE COURT:  You are not going to settle—
MR. DELVECCHIO:  I'm trying to prove our innocence.
THE COURT:  You are to ask questions only related to this case and you are not to answer back to the witness or make remarks to them.
That's arguing with the witness.  As long as you continue to only ask questions, then I will permit you to stay in the courtroom, but if you are not—
MR. DELVECCHIO:  All right.  All right.  All right.
THE COURT:  All right.  Take Mr. Delvecchio from the courtroom, please.
Tr. Mar. 13, pp. 103–107.

**B. Was the exclusion harmless error?**

**1. *Contribution to the verdict.***

■ Appellee argues that even if the later exclusions were error, the error was harmless. He points out first that appellant was not left unrepresented. Standby counsel stepped in to cross-examine the state's witnesses and to present a closing argument. The presence of counsel alone at trial can never be harmless *per se,* however, *Bustamonte, supra,* 456 F.2d at 275.

Appellee next argues that the evidence of guilt was overwhelming by the time appellant was removed. This contention mistakes the evidence necessary to withstand an acquittal motion for the evidence necessary to establish guilt beyond a reasonable doubt.

■ As a result of his later removals, appellant missed part or all of the testimony of Dr. Walker, the expert he had called on the effects of tear gas; Arthur Gomes, who was to testify on the qualifications and experience of the prison staff; Dale Brandfast, who testified regarding the absence of the task force of prison guards who would normally have handled the October 8 disturbance; and Charles Teeples, a medical assistant at the prison who testified to the condition of the defendants directly following the incident. He was also not present during closing argument, instruction of the jury, the proof of his prior conviction,[7] and the return of verdict.

■ The statements of these witnesses went to the heart of two defensive theories: first, that the use of tear gas prevented any reconstruction of events free of reasonable doubt; second, that the use of unreasonable force by the guards warranted the prisoners in defending themselves. By his absence the defendant was prevented from assisting in the development of these theories. Likewise he could not be seen by the witnesses who testified against him, or by the jurors who decided his fate. He could not assist in preparation for the presentation of a closing argument. The combination of these circumstances leaves, in our mind, a reasonable doubt that appellant's exclusion contributed to the guilty verdict obtained. Therefore, we find the constitutional error complained of was not harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**2. *Denial of due process.***

■ There is a second separate ground for our decision. The very absence of an accused, without good reason from so many stages of his trial calls for reversal. The defendant in this case could not hear the testimony of several witnesses. He could not observe the closing arguments of counsel, the jury instructions, of the trial to the court on the issue of his previous convic-

---

7. The defendant's prior conviction was tried to the court. One clear error raised in appellant's brief was the failure to obtain the consent of the defendant to such a trial.

*Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which incorporated the Sixth Amendment right to jury trial into the Fourteenth Amendment, also federalized the standards governing waiver of that right. The applicable test, set forth in *Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942), speaks of the "express, intelligent consent" of the "accused." *Id.* at 275, 277–278, 63 S.Ct. 236.

The accused in this case never was consulted, much less did he consent. After the jury had retired, and in the defendant's absence, the trial judge asked if counsel would stipulate to try the allegations of prior convictions to the court. Tr. Mar. 14, p. 91. The prosecutor was of the opinion that the presence of both defendants was needed as an evidentiary matter, *id.,* pp. 92, 94, but he did not object to the proposal of a bench trial. Counsel for appellant would neither object nor stipulate to a bench trial. *Id.,* p. 92. Finding no objection to its proposal, the court proceeded to try the question of prior convictions and to find that the allegations were true. *Id.,* p. 105.

The error of obtaining the defendant's consent in this matter is not lessened by the fact that he had been banished from the courtroom for misbehavior. Assuming that the banishment was justified, which it was not, *see text, supra,* the personal right to be consulted on the form of one's trial is qualified, if at all, by different considerations from those that qualify the participatory rights of presence and self-representation.

The waiver proceedings here bore no resemblance to the careful inquiry of the trial court in *United States v. Penick,* 496 F.2d 1105, 1107–1108 (7th Cir. 1974). Therefore, we would reverse as to the trial of the priors in any event.

tions. Most critically, he was forced to learn second-hand whether the jury had found him guilty or not.[8] The right of presence is extended not only to protect the integrity and reliability of the trial mechanism. As has been stated by the Fourth Circuit, the right of presence

> [assures] nondisruptive defendants the opportunity to observe—and, it is to be hoped, to understand—all stages of the trial not involving purely legal matters generally incomprehensible to the layman, in order to prevent the loss of confidence in courts as instruments of justice which secret trials would engender.

*United States v. Gregorio,* 497 F.2d 1253, 1258 and n. 10, (4th Cir. 1974). Those events, then, infringe on a societal interest in seeing that the forms of trial are preserved, that due process is not entirely a matter of contingencies. The law requires that the defendant be present at his trial. We reverse to ensure that "neither [life nor liberty] is taken except in the mode prescribed by law." *Bustamonte, supra,* 456 F.2d 274, *citing Hopt, supra,* 110 U.S. at 579, 4 S.Ct. 202.

### III. *CONCLUSION:*

Clearly, this was a trial where things were not going well. A measure of unorthodoxy, confusion, and delay is to be expected in any *pro se* case. *United States v. Dougherty,* 154 U.S.App.D.C. 76, 87, 473 F.2d 1113, 1124 (1972). These proceedings were particularly ill-starred. They featured a defendant who was twice the subject of competency motions; was incarcerated until the time of trial; was ignorant of the most basic conventions of courtroom procedure; failed to write out the questions he intended to ask; failed to confer with his own witnesses and therefore could not anticipate their testimony; felt keenly that he had suffered abuse at the hands of other witnesses; and knew only, or knew best, the prison style of assertiveness as a way of being recognized. We are thus not surprised that his self-representation cast his trial into serious jeopardy. Had the judge ordered standby counsel to take his place, on this record we might well have affirmed.[9]

However, the court first threatened and finally imposed a different sanction. It is quite apparent that, in doing so, the court identified the defendant's right to represent himself with the defendant's right to be present.[10] That identification is easy to make in the heat of trial. Both rights arise

---

**8.** *Compare* the defendant's remarks at the time he was sentenced:

> I haven't been given justice. I wasn't even here during the verdict. I don't know if they came in with a guilty verdict. . . .
>
> . . . . .
>
> I still don't know what the verdict was. I didn't hear it. All I know that I am charged with three felonies, attempt to commit murder, and there was never—no evidence shown throughout the entire testimony because—I was bringing out, I get an unfair trial and this is what I got, an unfair trial. I thought—I don't have nothing else to say. Tr. Apr. 11, pp. 50, 51.

**9.** We do not actually decide whether appellant waived his right to represent himself.

Our holding also leaves for another day several other issues raised in appellant's brief.

Because we do not decide that the defendant waived his right of self-representation, we do not decide whether a defendant who *has* waived that right, and chosen to withhold his trial strategy from standby counsel, can be heard to complain that he was not allowed to present and to cross-examine witnesses. *See*

*Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *United States v. Trapnell,* 512 F.2d 10, 12 (9th Cir. 1975); *United States v. Dujanovic,* 486 F.2d 182, 188 (9th Cir. 1973) (defendant representing himself is bound by his own conduct).

Because the defendant's later exclusions were not justified, we also do not decide whether a justifiable exclusion can ever be permanent. *Compare Allen, supra,* 397 U.S. at 343, 90 S.Ct. 1057 (right to be present can be reclaimed on assurance of proper conduct), *with Ives, supra,* 504 F.2d at 944–945 (defendant permanently excluded), and *United States v. Munn,* 507 F.2d 563, 568 (10th Cir. 1974) (trial court retains discretion to pass upon sincerity of defendant's recantation).

**10.** Thus, in explaining the conditions of reinstatement to appellant after his first expulsion, the court alternated references to the rights of presence and the right of self-representation:

> Mr. Delvecchio, if you are going to be *allowed to remain in the Courtroom,* you have to promise me that you will conduct yourself properly.
>
> . . . . .

from assurances of the Sixth Amendment.[11] Both rights are exercised when an accused stands *in propria persona*. Both rights may be curtailed on behalf of the same institutional interest.[12] And, as a factual matter, both rights are usually lost by the same or succeeding acts. *See, e. g., Allen, supra; United States v. Evans,* 542 F.2d 805 (10th Cir. 1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).

The similarities between these rights should not conceal other differences, however. Thus, the right of self-representation must be claimed to be granted, while the right to be present is extended as a matter of course. It has been suggested elsewhere that the right of presence may be more readily reclaimed. *Dougherty, supra,* 154 U.S.App.D.C. at 88, 473 F.2d at 1125 n. 20. Our discussion here implies that it is also less easily lost.

█ In simplest terms, the Constitution calls upon a trial court faced with a defendant who is representing himself, and who is misbehaving, to ask two questions. Can there be a fair and efficient trial so long as the defendant plays the role of attorney. Can there be a fair and efficient trial while the defendant remains in the courtroom? The requirement that both questions be asked is the unremarkable result of the defendant's concurrent exercise of two constitutional rights. In many cases the answers to these questions will be the same. Where only the representation right has been waived, however, the defendant must

be permitted to remain in the courtroom— on the understanding and condition that further misconduct may indeed waive his right to be present.

It is reasonable to suppose that there are cases in which a defendant becomes so aroused in arguing and questioning, so frustrated by an inevitable succession of defeats on matters he little understands, so angered at his inability to elicit favorable testimony and to discredit damaging testimony, that in representing himself he loses self-control and seriously disrupts his trial. Yet, the same accused may be capable of listening and even assisting while another person, more versed in the substance and procedure of law, conducts his defense. Appellant may have been such a person. On this record we do not know; neither could the trial judge have known.

Accordingly, the decision of the district court is reversed, with instructions to issue the writ, first allowing the state a reasonable time for bringing defendant to trial anew.

---

[I]f you feel that you can conduct yourself that way, then I will *permit you to* go ahead and *handle your defense.*

   .    .    .    .    .

If you feel that you can go ahead and conduct yourself as you have the last couple of days up until this morning, then I am going to *permit you to remain in the Courtroom.* (Emphasis added.)

Tr. Mar. 8, pp. 61, 62.

**11.** For the source of the right of presence, see text, *supra.* In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that the right of self-representation originates in the several guaranties of the Sixth Amendment and is applicable to the states through the Fourteenth Amendment's guarantee of due process of law. *Id.* at 818–819, 95 S.Ct. at 2532–2533; *see also Arnold v.*

*United States,* 414 F.2d 1058 (9th Cir. 1969), *cert. denied,* 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970).

**12.** For the interests justifying curtailment of the right of presence, see text, *supra.* In *Faretta, supra* n. 3 the Supreme Court indicated that

[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.

422 U.S. at 834 n. 46, 95 S.Ct. at 2541, *citing Allen, supra; accord, United States v. Kelley,* 539 F.2d 1199, 1202 (9th Cir.), *cert.* denied, 429 U.S. 963, 97 S.Ct. 393, 50 L.Ed.2d 332 (1976); *United States v. Dujanovic,* 486 F.2d 182, 187 (9th Cir. 1973).