Charlie Lee FOSTER,
Petitioner-Appellant,

v.

Louie L. WAINWRIGHT,
Respondent-Appellee.

No. 80–5795.

United States Court of Appeals,
Eleventh Circuit.

Oct. 1, 1982.

---

A. Thomas Mihok, Orlando, Fla., for petitioner-appellant.

Russell S. Bohn, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before MILLER *, Judge, TJOFLAT and CLARK, Circuit Judges.

PER CURIAM:

Charlie Lee Foster appeals the district court's denial of his petition for writ of habeas corpus. We affirm.

A Florida jury convicted Foster of two counts of assault with intent to commit a felony. The trial judge sentenced him to two consecutive fifteen-year prison terms, pursuant to which he is presently incarcerated. Having exhausted his state remedies, Foster filed a petition for writ of habeas corpus in the district court, alleging four grounds of relief: (1) that the state trial judge abused his discretion and violated Foster's sixth and fourteenth amendment rights by excluding him from the courtroom during his trial without sufficient cause; (2) that the trial judge refused to hear in open court Foster's testimony in support of his pre-trial motion to dismiss the indictment, in violation of his fourteenth amendment right to due process; (3) that the trial court's denial of Foster's motion for severance violated his fourteenth amendment right to due process; (4) that the trial court's failure to order *sua sponte* a hearing on Foster's competency to stand trial violated his fourteenth amendment right to due process.

The district court concluded that resolution of the last three of Foster's claims did not require an evidentiary hearing, and denied relief based on those claims in a comprehensive written opinion. We reject as meritless Petitioner's challenge to the district court's findings of fact and conclusions of law as to those three claims, and discuss them no further.

---

* Honorable Jack R. Miller, Judge for the U. S. Court of Customs and Patent Appeals, sitting by designation.

The district court conducted an evidentiary hearing on Petitioner's claim that he was improperly excluded from the courtroom during his trial, and subsequently entered an order and opinion denying relief on this claim as well. In order to decide Foster's appeal from this order, we shall set out at some length the relevant facts as they appear in the record and in unchallenged findings of the district court.

## I.

Petitioner's trial began on Monday, April 22, 1974. Before jury selection, the state judge conducted in his chambers a hearing on pre-trial motions, including Foster's motion to dismiss. When Foster's attorney, Larry Ullensvang, called Foster as a witness, the following colloquy ensued:

MR. ULLENSVANG: I'd like to have Mr. Foster sworn in as a witness.

FOSTER: I don't understand. What's it all about first?

THE COURT: Do you want to talk to him first? He wants you to give testimony in support of a—

FOSTER: I have found errors in this motion.

THE COURT: I'm going to let your lawyer do your talking for you. If you want to ask a question we'll take them one at a time. Hold up your right hand, it may be something you want me to know.

FOSTER: Is it possible I can get it in open Court?

THE COURT: This is where we are going to do this, right here.

FOSTER: No, I don't want to be sworn unless it's in open Court.

THE COURT: You are not going to make any statements, under oath or otherwise in this Court. Now, you be quiet for the rest of this hearing. If you open your mouth one time I'm going to consider it contempt and I'm going to impose the appropriate punishment if you say one word without me saying you can. Do you understand?

FOSTER: Yes, sir.

Petitioner testified in the district court that this contempt warning was the first warning he received. The state trial judge testified that Foster was hostile and antagonistic from the moment he entered the chambers, and that he attempted to control the proceedings.

During the selection of the jury, Foster rose from his seat and briefly interrupted the questioning of the venire to request that he be allowed to say something. The judge said, "No. Just have a seat." Foster complied, but later in the voir dire, he again attempted to address the court and again was told to have a seat. Following the selection of the jurors, and their dismissal from the courtroom, the judge summoned Foster and his attorney to the bench:

THE COURT: Mr. Ullensvang, bring your client forward.

Mr. Charlie Foster, I have been practicing law for ten years before I got to be a judge. I'll be a judge almost six years pretty soon and you are not helping your case one bit when you get up and try to make statements in Court. It's not going to help your case one bit. You're going to upset somebody on the jury and it puts me in bad sorts to tell you to sit down and be quiet. Henceforth, if you want to say something, if you want to testify in this case it's your privilege to do so and you can tell the jury anything you want within the bounds of evidence. Okay.

FOSTER: Okay.

THE COURT: Really, it's to your advantage not to try to make extraneous statements.

FOSTER: You understand why I did that?

THE COURT: I know what you are up to. . . .[1]

The second day of the trial was conducted without interruption by Foster; opening statements were made and the first seven prosecution witnesses were examined. However, on the third day, still during the State's case in chief, Foster interrupted the proceedings three times, the last of which

---

1. The judge testified in district court that his comment that he knew what Foster was up to meant that he knew Foster was attempting to inject error into the record.

resulted in his expulsion from the courtroom.

During the one hour and ten minute morning session on the third day, four prosecution witnesses were examined without interruption. Following the lunch recess, court reconvened at 2:10 p. m., and a bench conference was held out of the presence of the jury on the subject of locating and securing a certain witness. Following discussion among the attorneys and the court, this dialogue ensued:

THE COURT: Is there anything else?

FOSTER: We demand to have the witness testify. I'll just have to be forced to take a contempt charge.

THE COURT: We are going to do everything we can to get him. The State hasn't even finished with the case yet.

FOSTER: I'd like to object as regards the State's Exhibit, because the negative is not here for the picture.

THE COURT: You just sit down and your lawyer will do your talking for you. Have a seat.

As the district court found, this exchange establishes that Petitioner was aware that contempt could be invoked if he interrupted the proceedings, and that that possibility did not deter him.

The State then called its final witness. During the direct examination, Foster's attorney objected to the admissibility of a certain photograph the prosecution offered in evidence. When, after a bench conference on the question, the court announced that it would overrule the objection, Foster himself objected:

FOSTER: I object to that because it's not on the blow-up shot like the rest.

THE COURT: Take the jury out.

FOSTER: Because the car needs to be on that picture.

(Whereupon, the jury was dismissed from the courtroom and the following proceedings were had out of their presence.)

THE COURT: Now, Mr. Foster, Charles Foster, the law says that you have the right to be in the courtroom and be here when your trial progresses, but that does not give you the right to disrupt the proceedings. Do you understand that? This is the last time you are going to make an outburst in the courtroom. If you do it again you are going to sit this trial out up in your jail cell, which I have the right to do. It's up to you.

FOSTER: Can I say something?

THE COURT: Go ahead.

FOSTER: I'd like to have the right to defend myself from here on out.

THE COURT: That request is denied. Sit down. Bring in the jury.

The direct examination of the witness concluded soon after this episode, and Petitioner's attorney commenced his cross-examination. Shortly thereafter, Foster objected to the form of a question propounded by his attorney:

FOSTER: That's a leading question. My attorney led him.

THE COURT: Just take the jury out.

(Whereupon, the jury was dismissed from the courtroom and the following proceedings were had out of their presence.)

FOSTER: I'm down here for justice.

THE COURT: Just sit down and be quiet. Sit down. I'm going to—you sit down.

FOSTER: I have reason to believe—

THE COURT: We can do this the easy way or we can do it the hard way, Charles Foster.

FOSTER: My rights been violated already. I ain't got no business here. You violated my rights.

THE COURT: Do you want to stay in this courtroom, sir?

FOSTER: You violated—

THE COURT: Take him up to the jail.

MR. ULLENSVANG: Your Honor, I object. He has the right—

THE COURT: Allen versus Illinois. Now, he is going back up to the jail.

MR. ULLENSVANG: Your Honor, I don't believe that Allen versus Illinois—I don't believe this disturbance was enough.

THE COURT: It's enough for me. Take him up to the jail.

FOSTER: They violated four of my constitutional rights, and they are going to take me up—right is right.

THE COURT: Make sure that the jury's door is closed.

(Whereupon, the defendant, Charlie Foster, was removed from the courtroom.)

MR. ULLENSVANG: To clarify the record, Your Honor, you are sending Charles Foster to jail under Allen versus Illinois?

THE COURT: I'm sending him up to the jail because he has disrupted this Court. He has no right to take advantage of a disruption to his own advantage. He has the right to sit and be heard, to confront his accusers and cross examine them and to all the other Constitutional guarantees, but he is not going to disrupt this Court again.

We'll proceed for a little while and see if he wants to come down and behave himself. We'll do it just like—I can bind and gag him, I can do several other things. The best alternative, as I view it, is that he not be in the courtroom to disrupt this proceeding.

MR. ULLENSVANG: He is not being held in contempt?

THE COURT: Not yet.

MR. TAYLOR: Could we take a brief recess?

THE COURT: We'll take a ten-minute recess.

The recess was called at 3:00 p. m. After the recess, Foster's attorney concluded his cross-examination. This was followed by cross-examination by Foster's co-defendant, redirect by the State, and recross by counsel for both defendants. The State then rested, and the defendants' motions for directed verdicts of acquittal were argued. After denying the motions and dismissing the jury for the day, the court instructed Mr. Ullensvang to go to the jail and ask Foster whether he wanted to attend court the next day, emphasizing that he would have to behave himself if he wished to stay in the courtroom. Court then recessed for the day at 4:45 p. m.

The next morning, before court convened, Mr. Ullensvang, the court reporter, and three bailiffs, including one Jeffries, approached Petitioner in his cell:

MR. JEFFRIES: Charles Foster! Charles Foster!

(Whereupon, the defendant, Charlie Lee Foster, appeared at the door of the jail cell and the following proceedings took place.)

MR. JEFFRIES: Charlie, you are wanted in the courtroom by Judge Muszynski. Your lawyer is present and the court reporter.

MR. ULLENSVANG: The Judge instructed us to come up here and advise you that he has said that if you want to come to the courtroom you have the right to come to the courtroom and that you can come down to the courtroom, but he said he will not issue any written orders.

FOSTER: Tell the Court that I'll not come down to the courtroom until I receive a written order for me to come down. He ordered me out, now I'll not come down unless I receive a written order signed by B. C. Muszynski.

(Whereupon, the defendant, Charlie Lee Foster, turned and walked back to his jail cell.)

When court convened later in the morning, the judge announced for the record that Foster had declined his invitation to return to the courtroom, and that the court had advised the jailer that if at any time Foster changed his mind and wished to return, the jailer was to notify the court so that he could do so. The trial proceeded. Mr. Ullensvang rested his case for Foster without calling any witnesses, and Foster's co-defendant began the presentation of his case.

On the morning of the fifth and final day of the trial, the bailiff Jeffries again told Petitioner that the judge had stated that if he would conduct himself properly, he was welcome to participate in the remainder of the trial. Foster turned and walked to the rear of his cell without responding. Shortly thereafter, Foster refused to come to the courtroom to testify on behalf of his co-de-

fendant. Foster remained in his cell for the rest of the day, during which his co-defendant concluded his case, closing arguments were made, the jury was charged, and the jury returned its verdict.

## II.

In a non-capital case, a criminal defendant's voluntary absence after the trial has commenced in his presence need not prevent continuing the trial, to and including the return of the verdict. *See Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). There is no question but that Petitioner's absence from the last two days of his trial was voluntary within the meaning of *Taylor*. On the morning of the fourth day, Bailiff Jeffries told Foster that the judge had said he wanted him in the courtroom; Foster's attorney made clear to him that the court had instructed the bailiff and him to advise Foster that he had the right to return to the courtroom. Foster acknowledged at the hearing in the district court that he understood the bailiff who relayed the court's message to be acting in the service of the court. The invitation was renewed on the following morning. On this record, we agree with the district court that Foster waived his right to attend the last two days of the trial. The district court did not credit Foster's explanation that he felt that since the trial judge had ordered him from the courtroom, he could not return without a written order or in person permission from the judge, and we find no reason to question the district court's incredulity.

Thus, the issue is whether Foster's forced absence from the courtroom between 3:00 and 4:45 p.m. on the third day of trial amounted to a constitutional violation. In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court concluded that a criminal defendant may forfeit the benefit of his constitutional right to be present in the courtroom at every stage of his trial. The Court held:

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

*Id.* at 343, 90 S.Ct. at 1060–61 (footnote omitted).

Petitioner's arguments that the state judge did not adequately warn him that he risked expulsion, and that the judge did not adequately assure him he could return if he behaved himself, need not long detain us. Following the second of the three disruptions on the third day of trial, the judge clearly informed Foster that if he interrupted the proceedings again, he would be removed from the courtroom. The third disruption followed this warning by a matter of minutes. During the final exchange, in attempting to silence Foster, the court asked, "Do you want to stay in this courtroom, sir?" Foster was duly warned. Likewise, the portions of the state court record we have quoted make clear that Foster was repeatedly advised that he could return to the courtroom and remain there so long as he conducted himself in an orderly manner.

Foster's argument that his misconduct was not so disorderly, disruptive, and disrespectful as to justify his removal from the courtroom presents a closer question. The State correctly concedes that Foster's behavior was not nearly so extreme as was the defendant's in *Illinois v. Allen*, where the defendant repeatedly abused the judge verbally, threatened to reduce the judge to a corpse, tore his attorney's file and threw the papers on the floor, and persistently indicated that there would be no trial and that he would not be silenced. Likewise, it appears that Foster's misconduct fell short of that of most criminal defendants whose expulsions have been upheld under *Illinois v. Allen. See, e.g., Scurr v. Moore*, 647 F.2d 854 (8th Cir. 1981), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 670, 70 S.Ct. 638 (1982);

*United States v. Ives*, 504 F.2d 935 (9th Cir. 1974), *vacated on other grounds*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975). *But see United States v. Kizer*, 569 F.2d 504 (9th Cir.), *cert. denied*, 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978). That other defendants have engaged in more disruptive behavior than Foster is of little persuasive value, however, particularly in light of Petitioner's failure, and ours, to find authority for the proposition that misbehavior of the sort manifested by Foster does not justify expulsion.[2]

Our resolution of Petitioner's claim must take into account several considerations in addition to the quality of his behavior. First,

> In judging whether the ... events constituted sufficient grounds for concluding that the trial could not have proceeded fairly and efficiently so long as appellant was present in the courtroom, we are mindful that we are engaged, to some extent, in "second guessing." Deference would be owed in any event to the decision of the judge in whose hands the actual responsibility for courtroom conduct is placed. Discretion attends his position. *See Allen, supra*, 397 U.S. at 343, 90 S.Ct. at 1061; *Kizer, supra*, 569 F.2d at 507; *Ives, supra*, 504 F.2d at 942. Still further deference is due in this case, however, because we view the evidence from a cold record.

> > [T]he appellate court is not in as good a position as the trial judge to determine the effect a defendant's disruptive conduct may have had on the proceedings. Even though facial expressions, gestures and other nonverbal conduct are often tremendously significant, they cannot be transcribed by the court reporter.

> *Id.* We must, and do, give great deference to the decision of the trial judge.

*Badger v. Caldwell*, 587 F.2d 968, 973 (9th Cir. 1978).

Second, Petitioner does not argue, and the record does not intimate, that he was prejudiced by his absence from the courtroom during the period preceding the court's invitation that he return. This period encompassed the brief conclusion of his counsel's cross-examination of the last witness for the State, cross-examination by counsel for Foster's co-defendant, redirect examination by the prosecutor, and brief recross-examination by counsel for each defendant. So far as the record shows, Mr. Ullensvang continued his able representation of Foster during these examinations; there is no suggestion either in the state court record or in the record of the hearing below that he was hampered in any way by his client's absence. At the conclusion of the State's case, Mr. Ullensvang made and argued a motion for directed verdict of acquittal. There is no reasonable possibility that Foster was prejudiced by his absence from that legal argument.

█ Although *Illinois v. Allen* does not expressly identify prejudice to the defendant as a determinant of whether his removal from the courtroom is proper, we are persuaded that it is a factor pertinent to that question, and have recently so suggested. *United States v. Stratton*, 649 F.2d 1066, 1080 (5th Cir. 1981). In our view, the potential prejudice to the defense of the accused from his absence from the proceeding is, along with the degree of his misconduct and the adequacy of the warnings previously given, a part of the context in which the trial judge acts, and is therefore a factor to be considered in determining whether the judge commits constitutional error when he orders a disruptive defendant removed from the courtroom. We do not hold that a showing of prejudice is in all cases a prerequisite for relief on the basis of a defendant's unconstitutional removal from the courtroom; thus, we would not hold that a trial judge's otherwise clear abuse of discretion—such as, for example, ordering, impetuously and without ade-

---

**2.** *Badger v. Caldwell*, 587 F.2d 968 (9th Cir. 1978), on which Petitioner relies, is not such a case. Though the Court of Appeals for the Ninth Circuit there held that a criminal defendant's non-violent and non-abusive interruptions

of his trial did not justify his exclusion from the courtroom, the court expressly grounded its decision on the fact that the defendant was representing himself. *Id.* at 975.

quate warning, the removal of an only slightly disruptive defendant—is not a ground for relief if the defendant can show no prejudice. Rather, in a close case such as this one, the very slight potential for prejudice to the defendant weighs in favor of the State's position.[3]

Finally, we note that the state judge was aware of, and evidently considered, the alternatives to removal suggested by *Illinois v. Allen*: to bind and gag Foster or cite him for contempt. The judge had earlier threatened contempt, and Foster had demonstrated the likely ineffectiveness of that sanction by announcing his willingness to speak at risk of a contempt citation. See p. 1385, *supra*. And, immediately after ordering Foster removed from the court-

room the judge stated that he could bind and gag him, but that he viewed expulsion as a preferable alternative. See slip op. p. 5, p. 1385, *supra*.

 Considering the deference due the decision of the trial judge, the lack of potential or apparent prejudice to Petitioner, and the trial judge's reasonable rejection of responses to Petitioner's repeated interruptions other than removal, we hold that the district court properly denied the writ.

AFFIRMED.

---

**3.** To some extent, our retrospective analysis of the potential for prejudice to Foster has the benefit of considerations which may not have been available to the state judge when he ordered Foster's removal, such as, possibly, the proximity of the close of the State's case in chief. We are mindful, however, of the fact that when the judge expelled Foster, he knew at least that Mr. Ullensvang's cross-examina-

tion was well underway and that the State had presented the great bulk of its case, and that he stated, "We'll proceed for a little while and see if he wants to come down and behave himself." See p. 1386, *supra*. Thus, even from the perspective of the trial judge at the time of the decision, the potential for prejudice to Foster was minimal.