DOUGLAS DOYLE ROBERTS, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 16242

April 24, 1986          717 P.2d 1115

[Rehearing denied June 19, 1986]

*Conner & Steinheimer,* Reno, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mark Torvinen,* District Attorney, Elko County; *James Wilson,* Reno, for Respondent.

## OPINION

*Per Curiam:*

In the early morning hours of March 7, 1984, Ranae Loddy and Charlie Johnston were asleep in the bedroom of Johnston's trailer in Jackpot. They were awakened by a persistent knock on the trailer door. Ms. Loddy climbed from bed and went to answer the knock. When she opened the door, she was shot and killed by her boyfriend, the appellant, Douglas Doyle Roberts. Johnston exited the trailer via a back door and was not harmed. He phoned the police from a neighbor's trailer; and when they arrived, Roberts was arrested.

Prior to the night of the shooting Roberts was a senior highway maintenance foreman for the Nevada Department of Transportation. He had worked for the department for twenty-eight years and had no prior record of criminal activity. For six years he and Loddy had lived together in his home with her two children. Ms. Loddy and her children moved out of that house in September of 1983, although she and Roberts continued to see each other. Loddy's son, Rick, continued to live with Roberts for a month after she moved out. Thereafter, Rick occasionally visited Roberts on weekends.

Roberts testified that he believed that he and Loddy would get back together. With that hope in mind he kept Loddy's car on his insurance policy and continued to pay the premiums. He also gave Loddy money for her February, 1984, car payment and bought clothes for her children after they moved out. Roberts stated that he did these things because, ''I felt that they were still my family.'' Roberts insisted that he continued to love Loddy and that he saw no reason not to help her and the children.

On March 6, 1984, Roberts worked only half a day. He had

made arrangements with Loddy to take Rick to Twin Falls, Idaho, to retrieve one of Roberts' pickup trucks. Roberts intended to loan the truck to Rick so that the boy would have transportation. Loddy asked Roberts to stop at a drug store in Twin Falls and buy her some hair rinse. After retrieving the truck and the hair rinse, Roberts and Rick returned home around 4:00 p.m. Loddy agreed to get together with Roberts later that evening. Roberts then drove to a nightclub in Jackpot and "had a couple of drinks." He left that club and went to another where he stayed most of the rest of the evening, leaving once to see if Loddy was home and returning when he could not find her.

Roberts drank throughout the evening until the bar closed. The bartender at the club, Charles Sallee, testified that Roberts drank 15-25 drinks between 9:00 p.m. and 1:00 a.m. when the bar closed. According to Sallee, Roberts was intoxicated when he left the bar. Sallee testified that Roberts spent the evening drinking and dancing and that he did not appear to be upset. When Sallee closed the bar at 1:00 a.m., he and some of the other patrons agreed to meet Roberts at another bar.

Roberts testified that he drove by Loddy's trailer on his way to the other bar. He did not see Loddy's car at her trailer and drove on; however, as he passed Charlie Johnston's trailer he noticed Loddy's car parked there. Roberts stated that the next thing he remembered was Loddy's falling and his yelling for help. He had no other memory of the shooting, but he denied that he ever intended to kill Loddy.

Charlie Johnston testified that he and Loddy had spent the evening talking and had then gone to bed. At 1:19 a.m. they heard a knock on the door, and Loddy went to answer it, assuming it was Roberts. As the door opened, Johnston heard a "pop" and saw Loddy fall. He then saw Roberts kneel beside her. As stated above, Johnston left via a backdoor and called the police.

When sheriff's deputies arrived at Johnston's trailer, they found Roberts' car in the driveway with the lights on and the engine running. Roberts was sitting in the trailer doorway cradling Loddy in his lap. He was calling for someone to come help. When the deputies approached him Roberts was whining and saying, "Oh my God, I killed her, please kill me. Please put me out of my misery." The deputies found Roberts' gun on the couch where he had tossed it. Roberts was then taken into custody. He had to be strapped to a stretcher to get him to leave Loddy's body.

Roberts was tried and found guilty of second degree murder.

The only issue it is necessary for us to address is the trial court's refusal to grant Roberts an instruction on voluntary manslaughter. We conclude that this refusal was error warranting the reversal of Roberts' conviction and the granting of a new trial. A defendant in a criminal case is entitled, upon request, to a jury

instruction on his theory of the case so long as there is some evidence, no matter how weak or incredible, to support it. Williams v. State, 99 Nev. 530, 665 P.2d 260 (1983).

The crime of voluntary manslaughter is defined and described in NRS 200.040, NRS 200.050 and NRS 200.060, the pertinent language being set forth in the margin.[1] It appears that there is some evidence in this case to support a jury finding that the crime of manslaughter had been committed.[2] Indeed, the trial judge himself observed that the jury could have inferred that the defendant was acting in the heat of passion.[3] That there is evi-

---

[1]NRS 200.040 states:

200.040 "Manslaughter" defined.
1. Manslaughter:
(a) Is the unlawful killing of a human being, without malice express or implied, and without any mixture of deliberation

. . . .
2. Manslaughter must be voluntary, upon a sudden heat of passion, caused by provocation apparently sufficient to make the passion irresistible. . . .

NRS 200.050 states:

200.050 "Voluntary Manslaughter" defined. In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.

NRS 200.060 states:

200.060 When killing punished as murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for, if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.

[2]As indicated, the defendant and the victim had a long-standing relationship. He continued after their separation to provide her with financial support and to see her romantically. He said that he considered the victim and her children to be his family. The day of the killing was to a large degree dedicated to her convenience. He had taken a half day off from his job to furnish her son with a truck. He ran an errand for her and expected to spend that evening with her. He would have been justified in viewing her "standing him up" as a callused insult, greatly aggravated by her taking up sexually with another man on the night of his planned get-together with her. It is not unreasonable to infer from such circumstances that his discovery provoked him into a sudden and excessive anger or "heat of passion," as the statute reads.

[3]This observation was made by the trial court following arguments by the attorneys on the issue of granting a voluntary manslaughter instruction. We agree with the trial court that the jury may infer that Roberts was in a rage (*i.e.*, the heat of passion) from his testimony that he cannot recall the shooting and the events immediately preceding it.

dence to support a finding of the "sudden" nature of the passion cannot be gainsaid. NRS 200.040 requires that the "sudden heat of passion" be caused by "a provocation apparently sufficient to make the passion irresistible." NRS 200.050 additionally defines sufficient provocation in terms of a "serious and highly provoking injury inflicted upon the person killing."

This appeal turns on the question of whether there is evidential support for a fact finding that this passion could have been caused by sufficient provocation, namely, "a serious and highly provoking injury" inflicted upon Roberts.

A serious and highly provoking injury need not be a direct physical assault on the accused. *See* Nevada v. Ah Mook, 12 Nev. 369 (1877).[4]

From the foregoing, no reason presents itself why a voluntary manslaughter instruction should *not* have been given. Accordingly, the conviction is reversed and the cause remanded for retrial.

_____

[4]Ah Mook admitted killing the victim but claimed that a very short time prior to the killing he had witnessed a fight between the deceased and Ah Mook's brother. His brother was shot, and when Ah Mook asked the deceased why he shot his brother, the deceased replied that it was none of his business and that if Ah Mook did not look out he would kill him too. Ah Mook stepped into his house, got a pistol and shot and killed the deceased. The trial court gave a manslaughter instruction under these circumstances.

Although the propriety of such an instruction was not in issue on appeal, this court discussed the instruction at some length, observing that if the killing was the "result of a mere blind impulse of passion," then it could not be murder, unless, of course, "the passion was caused by insufficient provocation. . . ."