COMMONWEALTH vs. KENNETH A. LUCIANO
(and a consolidated case).[1]

No. 09-P-1585.

Berkshire. September 8, 2010. - March 16, 2011.

Present: COHEN, GRAINGER, & MEADE, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Due Process of Law,*
Transcript of trial. *Practice, Criminal,* Transcript of evidence, Harmless error, Instructions to jury, Assistance of counsel. *Constitutional Law,* Equal
protection of laws. *Error, Harmless. Evidence,* Joint venturer, Expert
opinion. *Witness,* Police officer.

At a criminal trial, the judge erred in denying without a hearing an indigent
defendant's motion for funds to obtain a transcript of a prior trial, where a
hearing on such a request was mandated by G. L. c. 261, § 27C(4), and
where the denial of the defendant's motion on the ground that she failed to
make a particularized showing of need violated her constitutional right to
equal protection [57-59]; reversal was not required however, where the error was harmless beyond a reasonable doubt [59-60].
At the trial of indictments charging criminal codefendants with, inter alia, assault and battery by means of a dangerous weapon, the judge's erroneous
jury instruction — which did not inform the jury that in order to find
either of the defendants guilty on a joint venture theory, it was necessary
for the Commonwealth to prove that the defendant knew his or her coventurer was armed with a dangerous weapon — created a substantial risk of a
miscarriage of justice as to one defendant, where the jury could have found
that she did not know her coventurers had dangerous weapons [60-61];
however, the erroneous instruction created no substantial risk of a miscarriage of justice as to the other defendant, who faced two distinct charges,
where, given the evidence, there was no real risk that the jury would have
reached a different result [61].
At a criminal trial, no substantial risk of a miscarriage of justice resulted from
the admission in evidence of testimony by a police officer explaining his
actions after making observations at the crime scene. [61-62]
There was no merit to the claims of criminal codefendants that they received
ineffective assistance of counsel at trial. [62]

INDICTMENTS found and returned in the Superior Court Department on September 14 and 17, 2007, respectively.

---

[1]Commonwealth vs. Kimberly A. White.

The cases were tried before *John A. Agostini*, J., and a motion for a new trial was considered by him.

*Lori H. Levinson* for Kimberly A. White.

*Ian Stone* for Kenneth A. Luciano.

*Karen L. Carlo*, Assistant District Attorney, for the Commonwealth.

COHEN, J. In January, 2009, the defendants, Kenneth Luciano and Kimberly White, were tried before a jury on indictments charging armed robbery, witness intimidation, and two counts each of assault and battery by means of a dangerous weapon. The jury acquitted the defendants of armed robbery and witness intimidation, but were deadlocked as to the remaining charges. Two months later a second jury trial was held before the same judge, at which time each defendant was convicted of two counts of assault and battery by means of a dangerous weapon. Before us are the defendants' appeals from the judgments of conviction and from the denial of their motions for a new trial.

The defendants' primary claim arises from the trial judge's denial of their requests to obtain a transcript of the first trial for use in the second trial. While we agree that the transcript should have been made available to them, we conclude that, in the circumstances of this case, the defendants are not entitled to appellate relief. We further conclude that, as conceded by the Commonwealth, an omission in the judge's instructions on joint venture requires that defendant White's convictions of assault and battery by means of a dangerous weapon be reversed. In all other respects, we affirm.

*Background.* The Commonwealth introduced evidence from which the jury could find that, on August 22, 2007, White lured the victim, Donald Reynolds, to a designated location in Adams, where he was beaten by Luciano and another man, Timothy Malloy. At one time or another, Malloy, Reynolds and Luciano all had been involved with White. Indeed, each of them had fathered a child with her. For some period prior to the beating incident, White had been living with Luciano. However, after discovering that Reynolds had won some money at a casino, she began to see him again and led him to believe that they were dating.

Reynolds had strong feelings for White. After learning that Luciano had fathered a child with another woman, Reynolds

tried to use that fact to persuade White to reunite with him permanently. White told Reynolds that she would leave Luciano if Reynolds could corroborate the accusation. Reynolds therefore paid the other woman for a copy of papers containing test results establishing Luciano's paternity.

On the day of the beating, Reynolds went with White to a shopping mall and spent thousands of dollars on her and her children. Within a few hours, however, Reynolds spotted White and her children in the company of Luciano at a McDonald's "drive-thru." A heated argument (but no violence) ensued between the two men.

That evening, White called Reynolds to tell him that what happened at McDonald's was "stupid." She also told him that she would like to confront Luciano with the paternity papers, but was afraid to do so herself. She informed Reynolds that if he gave the papers to Luciano, she would kiss him, announce that she would marry him, and they would "ride off" together. Later that night, she left several voice mail messages for Reynolds telling him that she was with Malloy and Luciano on Spring Street, and urging him to come over.

After listening to the messages, Reynolds went to Spring Street. When he arrived, White pointed him down an alley to a door, which (unbeknownst to Reynolds) was the entrance to Malloy's residence. After Reynolds refused to walk down the alley, White went to the door and knocked on it. Reynolds then caught sight of Luciano hiding in the alley and walked towards him.

Reynolds and Luciano began to argue. As they did, Malloy came from somewhere to the left of Reynolds and began to beat him on the head with a large, heavy glass bottle. Luciano, who worked as a security guard, joined in the attack, using a long, black security flashlight to strike Reynolds. Eventually, White and Luciano departed together in White's car, and Malloy, too, left the scene. Reynolds was left bleeding and lying on the ground until help arrived.

The theory of the defense was that the defendants had nothing to do with Reynolds' beating and that, after being attacked by one or more other individuals, Reynolds accused the defendants because he was upset and angry that White was choosing Luciano over him.

*Discussion.* 1. *Transcript.* Immediately after the completion of the first trial, White, who previously had been found to be indigent, moved for funds to obtain the transcript of the prior proceedings, stating in her motion that "a certified copy of the transcript of the prior trial [was] necessary for her to properly prepare for the upcoming [re]trial." The motion requested a hearing at the court's earliest convenience and was accompanied by an affidavit of counsel attesting to White's continued indigency and inability to pay for the transcript. The judge denied the motion without a hearing. As he later explained,[2] his reason for denying the motion was that the "general, non-specific reason" offered by White was "insufficient to incur the expense and time necessary to obtain such transcript," and because delaying the trial in order to obtain a transcript would have been "inconsistent with the rights of the defendants and the Commonwealth for timely adjudication of criminal matters."

On the first day of the second trial, the transcript issue arose again. Immediately after the prosecutor's direct examination of Reynolds, Luciano's counsel orally moved that, if nothing else, Reynold's testimony from the first trial should be transcribed over the weekend so that it could be used to impeach Reynolds during cross-examination on a particular detail of his direct testimony, i.e., that he was holding the paternity papers in his hand when he approached Luciano. The judge said that this would be impossible, and denied the request. Both defendants objected.

Requests by indigent defendants for funds to prepare their defense are governed by G. L. c. 261, §§ 27A-27G. Pertinent here, G. L. c. 261, § 27C(4), as amended by St. 1980, c. 539, § 7, provides: "If the court makes a finding of indigency, it shall not deny any request with respect to normal fees and costs, and it shall not deny any request with respect to extra fees and costs if it finds the document, service or object is *reasonably necessary* to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay. *The court shall not deny any request without first holding a hearing thereon;* and if there is an appeal pursuant to section twenty-seven D following a denial, the court shall, within three days, set forth its written findings and reasons justifying such denial, which

---

[2]The judge's explanation appears in his post-trial order denying the defendants' motions for stay of execution of sentence.

document shall be part of the record on appeal."[3] (Emphasis supplied.)

As mandated by § 27C(4), White's motion should not have been denied without a hearing. Indeed, this case well illustrates the utility of such a requirement. As the record stands, the judge's concerns about delay are unsubstantiated. A hearing could have shed light on the amount of time needed for production of the transcript, whether it was feasible to obtain the transcript on an expedited basis, and whether the defendants were willing to waive their rights to a speedy trial in order to secure the transcript before the retrial.[4]

Even more fundamentally, the denial of White's motion on the ground that she failed to make a particularized showing of need was a violation of her constitutional right to equal protection, as established in *Britt* v. *North Carolina*, 404 U.S. 226 (1971). In that case, the United States Supreme Court concluded that State courts generally must provide indigent defendants with a free copy of the transcript of a mistrial for use in a subsequent trial without requiring the defendant to specify how the transcript might be useful. *Id.* at 228. As the Supreme Court observed, "even in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses." *Ibid.* Thus, to be consistent with the constitutional requirements discussed in *Britt*, the "reasonably necessary" standard of § 27C(4) generally must be deemed to be met whenever a defendant requests funds

---

[3] It is not contended by the Commonwealth that G. L. c. 261, § 27D, is the exclusive route by which the applicant may obtain appellate review of the denial of a request for funds.

[4] We are aware that, when this case was pending in the trial court, transcript production was not subject to time standards as it is now. See Administrative Order 09-2, issued on December 29, 2009, by the Chief Justice for Administration, establishing a time standard of 120 days for the production of transcripts ordered on or after January 1, 2010, in both civil and criminal cases. We also are aware that before time standards, long delays in transcript production were not uncommon. For whatever reason, however, the transcript of the defendants' second trial ultimately was able to be produced very quickly. The docket reflects that, in March, 2009, soon after the conclusion of the retrial, the transcript of the second trial was ordered and prepared in only one week.

for the transcript of a prior mistrial, even if the defendant has not made a specific showing of the transcript's utility.[5]

While it may be that the judge nevertheless had discretion to deny the midtrial request of Luciano's counsel for partial transcription because of its timing and the practical difficulties it presented, we need not decide the issue, because neither that ruling nor the judge's ruling on White's motion necessitates appellate relief. The only prejudice claimed by the defendants is their alleged inability to have impeached Reynolds on a minor detail — whether, when walking towards Luciano in the alley, he had the paternity papers in his hand, as he testified on direct examination.[6] According to the defendants, if they had been able to show that Reynolds was not holding the papers as he went down the alley, his account of why he came to Spring Street would "not make any sense." We think, however, that the defendants greatly exaggerate the value of establishing this discrepancy.

Whether Reynolds actually had the paternity papers in hand when he saw Luciano and walked towards him bore no relationship to the main issue in the case, which was whether the defendants were present and participated (as principal or joint venturer) in the beating.[7] The proposed impeachment went only to the collateral issue of Reynolds' general credibility. See *Commonwealth* v. *Farley*, 443 Mass. 740, 750-751 (2005). As to that issue, the defendants had at their disposal far more potent evidence that apparently did not persuade the jury to disbelieve

---

[5]*Commonwealth* v. *Souza*, 397 Mass. 236, 242 (1986), relied upon by the Commonwealth, does not mandate a different result. Without acknowledging *Britt*, *Souza* affirmed the denial of the defendant's motion for a continuance pending appeal of the denial of his motion for a transcript of his prior bench trial. To the extent that there is tension between the constitutional requirements explicated in *Britt* and the manner in which *Souza* construed G. L. c. 261, § 27C(4), in the factual context of that case, the reasoning of the United States Supreme Court is controlling in the circumstances presented here.

[6]We do not understand the defendants to argue that the transcript was needed for discovery purposes. Here, any such contention would be unavailing where the defendants were represented at the second trial by the same attorneys who appeared for them at the first trial, and the trials were held only two months apart. See *Commonwealth* v. *MacDonald (No. 2)*, 368 Mass. 403, 405-407 (1975).

[7]For example, there was no claim of self-defense, where Reynolds' failure to have the paternity papers in hand may have supported the inference that he had gone to Spring Street not to fulfil White's request, but to pick a fight with the defendants.

Reynolds.[8] Furthermore, even without the benefit of the transcript, Luciano's counsel was able to draw on his memory of the prior trial to cross-examine Reynolds effectively on the paternity papers — eliciting an admission that Reynolds was uncertain and confused about whether he had them in his possession when he walked down the alley. In these circumstances, the failure to afford the defendants a transcript of the mistrial was inconsequential. Accordingly, even though the error was of constitutional dimension, it was harmless beyond a reasonable doubt.[9] See generally *Commonwealth* v. *Tague*, 434 Mass. 510, 515-516 (2001).

2. *Instructions on joint venture.* It is not disputed that the judge's final charge did not inform the jury that in order to find either of the defendants guilty of assault and battery by means of a dangerous weapon on a theory of joint venture, it was necessary for the Commonwealth to prove beyond a reasonable doubt that the defendant knew that his or her coventurer was armed with a dangerous weapon.[10] Because neither defendant objected at trial,[11] we consider only whether the omission created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Redmond*, 53 Mass. App. Ct. 1, 7 (2001).

---

[8]In addition to developing the theme that Reynolds was a jilted lover with a motive to lie, the defendants were able to point to other indicia of Reynolds's unreliability as a witness, including his criminal record and evidence that he suffered from mental difficulties.

[9]There is no merit to the defendants' contention that denying an indigent defendant a transcript of a mistrial is a structural error that mandates reversal regardless of the existence of prejudice. Notably, in *Britt*, despite the trial court's constitutional error in denying the defendant's motion for a transcript, the Supreme Court nevertheless affirmed his conviction because he had an informal alternative available to him that was substantially equivalent to a transcript. See *Britt* v. *North Carolina*, supra at 228. See also *Commonwealth* v. *MacDonald (No. 2)*, supra at 407.

[10]This case was tried prior to the Supreme Judicial Court's decision in *Commonwealth* v. *Zanetti*, 454 Mass. 449 (2009), prospectively adopting, for use in jury instructions, the language of aiding and abetting rather than joint venture. *Id.* at 466-467 & n.2.

[11]The record does not bear out the defendants' claim that they preserved their rights on this issue when, during deliberations, the jury asked for clarification as to "whether joint venture pertains to just the weapons or the parties involved." To the contrary, after discussion with the judge, both defense counsel expressly stated that they had "no objection" to the judge's proposed course of action, which was simply to state that joint venture pertains to the parties as reflected in his original instructions, and that if the jury had any additional questions they should feel free to send them out.

As to defendant White, the Commonwealth concedes that her convictions cannot stand. After independent review, see *Commonwealth* v. *McClary*, 33 Mass. App. Ct. 678, 686 n.6 (1992), we conclude that the concession is appropriate. On the state of the evidence, the jury could have found that, although White laid a trap for Reynolds to be assaulted by Luciano and Malloy, she did not know that Luciano and Malloy had dangerous weapons.

As to defendant Luciano, we discern no substantial risk of a miscarriage of justice resulting from the omitted instruction. There were two distinct charges against Luciano: a charge of "assault and battery by means of a dangerous weapon, to wit: a flashlight," which was based upon his own actions; and a charge of "assault and battery by means of a dangerous weapon, to wit: a glass bottle," which was based upon the actions of Luciano's alleged coventurer, Malloy. The evidence was that Malloy initiated the physical attack on Reynolds by coming at him from the left and striking him with the bottle, that Luciano immediately joined in by hitting Reynolds with a flashlight, and that Luciano and Malloy continued to strike Reynolds at the same time, using their respective weapons. In these circumstances, there was no real risk that the jury would have reached a different result had they been told expressly that they had to find beyond a reasonable doubt that Luciano knew that Malloy was armed. See *Commonwealth* v. *Palmer*, 59 Mass. App. Ct. 415, 426 (2003).[12]

3. *Other issues*. a. *Police officer's testimony*. Although he did not object below, defendant Luciano now claims that the investigating police officer gave what amounted to an improper expert opinion as to guilt. The officer testified that after speaking with Reynolds as he lay bleeding in the road and after making observations at the scene, the officer notified other police officers that there was "probable cause to arrest" two individuals: Luciano and Malloy. We disagree that this testimony was an impermissible comment on the defendants' guilt; it was an explanation of

---

[12]Luciano's alternative argument, that his two convictions are duplicative and subject him to double jeopardy, also is without merit. There were two distinct charges against Luciano involving different actors and different weapons. Luciano properly could be punished as to both.

the officer's actions, elicited to counteract the defendants' claim from the inception of the trial that the police investigation was inadequate and misdirected. See *Commonwealth* v. *Lodge*, 431 Mass. 461, 467 (2000); *Commonwealth* v. *Avila*, 454 Mass. 744, 753-754 (2009); *Commonwealth* v. *Flanagan*, 20 Mass. App. Ct. 472, 476 n.2 (1985).

In any event, no substantial risk of a miscarriage of justice resulted from the admission of this testimony. The officer's determination that there was probable cause to arrest was implicit in the arrest itself. Furthermore, in view of the judge's thorough instructions as to the jury's function, the presumption of innocence, and the Commonwealth's obligation to prove the defendants' guilt beyond a reasonable doubt, we are confident that the jury would not have understood the officer's testimony that, at the time, he believed that the lesser probable cause standard had been met, as supplanting their responsibility as fact finders or as diminishing the Commonwealth's burden of proof.

b. *Ineffective assistance of counsel.* We have reviewed the defendants' various claims of ineffective assistance and conclude that they fall short under the *Saferian* standard. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The unpreserved errors already discussed fare no better when recast in terms of ineffective assistance. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 295-296 (2002). The evidentiary objections that the defendants claim their trial counsel should have made most likely would have been futile or would have made no material difference in the case. White's trial counsel cannot be faulted for deciding not to mount a weak alibi defense that did not account for the time when the crime occurred; nor was he ineffective in failing to call Malloy as a witness, where Malloy was asserting his privilege under the Fifth Amendment to the United States Constitution. Notably, White's claims are unsupported by any affidavits from trial counsel, Malloy, or herself. The motion judge, who also was the trial judge, was entitled to reject them.

4. *Conclusion.* Defendant White's two convictions of assault and battery by means of a dangerous weapon are reversed and the case remanded to the trial court for further proceedings.[13]

---

[13]The parties' positions as to the relief that may be granted in the trial court are not adequately briefed, and therefore, we do not address them.

The judgments of conviction as to defendant Luciano are affirmed, as is the denial of his motion for a new trial.

*So ordered.*