133 Nev., Advance Opinion 88

IN THE SUPREME COURT OF THE STATE OF NEVADA

LESEAN TARUS COLLINS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 69269

**FILED**

NOV 22 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of one count of murder and one count of robbery. Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

*Affirmed.*

David M. Schieck, Special Public Defender, and JoNell Thomas, Chief Deputy Special Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Respondent.

_____

BEFORE DOUGLAS, GIBBONS and PICKERING, JJ.

*OPINION*

By the Court, PICKERING, J.:

A jury convicted Lesean Collins of robbery and first-degree murder, for which he was sentenced to life in prison without the possibility of parole. On appeal, Collins argues that his constitutional rights were violated on the first day of trial when the district court barred him from the courtroom for disruptive conduct for a two-hour period, during which it

17-40342

excused individual jurors for hardship, statutory ineligibility, and language barrier reasons. Collins also raises claims of evidentiary and instructional error and challenges the sufficiency of the evidence to sustain his convictions. Because none of these issues requires reversal, we affirm.

## I.

Four days after Brandi Payton went missing, two ATV riders discovered her decomposed body in a ravine. Drag marks led through the dirt and brush to the body. No purse, wallet, cell phone, or means of identification or transportation were found. Brandi's shirt was pulled up over her head, and she was shoeless. Three of her acrylic fingernails had broken off—two were found at the scene—and one of her pockets was inside out. Some nearby rocks had blood on them.

Brandi's sister identified her body. Although identifiable, the body had decomposed too much for the coroner to definitively state the cause of death. The autopsy established that before she died Brandi sustained three blows to her head from a rod-like instrument. While the blows did not fracture Brandi's skull, they were strong enough to render her unconscious. The coroner deemed Brandi's death consistent with asphyxiation or being locked in the trunk of a car in southern Nevada's late summer heat.

Circumstantial evidence tied Collins to Brandi and to her robbery and death. Collins and Brandi knew one another. Brandi occasionally dealt drugs and used cell phones and rental cars to conduct business. Cell phone records showed that Collins and Brandi exchanged numerous calls and texts the day she disappeared. Brandi's phone received its last call at 3:38 p.m., then shut off. Earlier, both Collins's and Brandi's phones sent signals through a cell phone tower close to Collins's girlfriend's house, where Collins often stayed during the day. That night, Collins's cell

phone signals placed him in the remote area where Brandi's body was found.

Collins's girlfriend testified that Collins picked her up from work the day Brandi disappeared. He had jewelry with him he didn't have before, including a necklace he later asked his girlfriend to pawn and a Rolex bracelet (at trial the State proved both pieces of jewelry had been Brandi's). When they got home, the girlfriend found a gold Hyundai parked in the garage. The carpet in the house was soiled and something had spattered on the laundry room walls. Collins told his girlfriend that Brandi rented the car for him and that he had spilled oil on the carpet, which he tried to clean with bleach. That night, Collins left in the Hyundai, returned, washed the Hyundai, and fell asleep outside in the car. At some point, the North Las Vegas police came by to check on the car and its occupant. Rather than get out as asked, Collins sped off, eluding the police. Collins's girlfriend found a long acrylic fingernail in her home, which Collins admitted to her was Brandi's.

As part of their investigation, the police interviewed Brandi's boyfriend, Rufus. They ruled him out as a suspect and focused on Collins. Several weeks after finding Brandi's body, the police found the gold Hyundai, minus its tires. Tests showed traces of blood belonging to Brandi on the Hyundai's trunk mat. The police also tested the spatter on the walls of Collins's girlfriend's home and confirmed it was Brandi's blood.

Collins was arrested for, charged with, and convicted of robbery and first-degree murder. He appeals.

II.

A criminal defendant has the right under the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments to be present at every stage of the trial.

*Illinois v. Allen*, 397 U.S. 337, 338 (1970); *United States v. Gagnon*, 470 U.S. 522, 526 (1985); *see* Nev. Const. art. I, § 8. Collins complains that the district court deprived him of this right when it excused him from the courtroom for the last two hours of the first day of trial.

A.

While a defendant has the right to be present at every stage of trial, that right is not absolute. *Allen*, 397 U.S. at 342-43. A defendant may lose the right to attend trial if, after being warned, he persists in disrupting the proceedings by engaging in conduct inimical to the dignity and decorum required in a court of law. *Id.* at 343; *see* NRS 175.387(1)(c). A district court's decision to remove a defendant from the courtroom for disruptive behavior is reviewed under an abuse-of-discretion standard. *United States v. Hellems*, 866 F.3d 856, 863-64 (8th Cir. 2017); *cf. Tanksley v. State*, 113 Nev. 997, 1001-02, 946 P.2d 148, 150 (1997) (holding in an analogous context that "[a] defendant may be denied his right of self-representation if he or she is unable or unwilling to abide by rules of courtroom procedure" and that, because the trial court judge has "the opportunity to observe" the defendant's "demeanor and conduct" first-hand, "[t]his court will not substitute its evaluation for that of the district court judge's own personal observations and impressions").

"[C]ourts must indulge every reasonable presumption against the loss of constitutional rights." *Allen*, 397 U.S. at 343 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). But district court judges "confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Id.*

A defendant who is removed for courtroom misconduct impliedly waives the right to be present. *See United States v. Benabe*, 654 F.3d 753, 768 (7th Cir. 2011). The waiver is implied, not explicit. *Id.* Though not amenable to a one-size-fits-all approach, the record supporting waiver should demonstrate, at minimum, that the defendant understands the right he is waiving and that the need to maintain the dignity of and control over the proceedings justifies the defendant's removal. *See Allen*, 397 U.S. at 345-46. A district court faced with a disruptive defendant should: (1) advise the defendant that his or her conduct is not acceptable; (2) warn the defendant that persisting in the disruptive conduct will lead to removal; (3) if the conduct persists, determine whether it warrants the defendant's removal or a lesser measure will suffice; and (4) bring the defendant back to court periodically to advise that he or she may return if the defendant credibly promises to desist from the disruptive conduct. Federal Judicial Ctr., *Benchbook for U.S. Dist. Ct. Judges* § 5.01 (2013) (interpreting Fed. R. Crim. P. 43(c)); *see* NRS 175.387. Prejudice to the defendant also factors into the removal decision and its review on appeal. *E.g., Foster v. Wainwright*, 686 F.2d 1382, 1388 (11th Cir. 1982) ("Although *Illinois v. Allen* does not expressly identify prejudice to the defendant as a determinant of whether his removal from the courtroom is proper . . . the potential prejudice to the defense of the accused from his absence from the proceeding is, along with the degree of his misconduct and the adequacy of the warnings previously given, a part of the context in which the trial judge acts, and is therefore a factor to be considered in determining whether the judge commits constitutional error when he orders a disruptive defendant removed from the courtroom.").

 

## B.

Collins had a history of difficulties in district court. Trial was delayed several times due to Collins's dissatisfaction with his lawyers. At one pretrial hearing, he repeatedly interrupted the district judge and said, referring to the prosecutor, that he was going to "knock this bitch-ass out of the trial." At another pretrial conference, Collins, who was in prison for another offense, indicated that he did not "want to dress out for trial but [would] wear his regular prisoner clothing." At the final pretrial conference, Collins objected to being in court at all and had his lawyer state on the record that Collins "was not going to come to the trial."

Rather than excuse Collins, the district court ordered the correction officers to bring Collins back to court on the first day of trial for canvassing on his announced intention not to attend trial. That morning, the officers reported that Collins refused to change out of jail clothes or to allow them to remove his shackles and belly chains. While the jury pool waited in the jury assembly room, the judge had the officers bring Collins into court shackled and in jail clothes so she could address him directly outside the presence of the jury. *See Chandler v. State*, 92 Nev. 299, 300, 550 P.2d 159, 159-60 (1976) (finding constitutional but harmless error in the defendant having been brought into court in handcuffs in front of the jury).

"Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri*, 544 U.S. 622, 630 (2005); *see Grooms v. State*, 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980) ("The presumption of innocence is incompatible with the garb of guilt.") (citing *Estelle v. Williams*, 425 U.S. 501, 504 (1976)). The district judge explained to Collins that appearing in front of the jury in shackles and jail clothes undermined the dignity of the proceeding and created an




unacceptable risk of juror prejudice. *See Deck*, 544 U.S. at 631 (noting that "judges must seek to maintain a judicial process that is a dignified process . . . , which includes respectful treatment of defendants" and that "the use of shackles at trial affronts the dignity and decorum of judicial proceedings that the judge is seeking to uphold") (quoting *Allen*, 397 U.S. at 344) (internal editing marks omitted); *State v. McKay*, 63 Nev. 118, 163, 165 P.2d 389, 409 (1946) ("we regard a trial with the prisoner in irons as obnoxious to the spirit of our laws and all ideas of justice . . . .") (quotation omitted). The judge advised Collins that, while "[y]ou certainly have the right not to be compelled to be present for [ ] trial," she would not "go down the road . . . where we set a trial up before we even begin for appeal because you are desiring to be present wearing a certain set of clothing and wearing your chains." The judge noted on the record that Collins refused to look at or acknowledge her. Pressed to explain why he insisted on wearing his jail clothes and chains, Collins stated that they were "comfortable," that "I don't wear other people's clothes," and that "[t]here is no such thing as appropriate clothes."

With input from the lawyers, the court offered Collins three options: remove the chains and change into civilian clothes, remove the chains and remain in jail clothes but turn the shirt inside out so the jury would not see "Clark County Detention Center" printed on it, or be deemed to have waived his right to be present at trial. The court declared a recess so defense counsel, who advised Collins on the record against appearing in jail clothes and chains, could speak with Collins privately. After the recess, Collins declared, "Your Honor, I decline all the options that you put forth. If you have to force me to do something then you have to force me to do it."

The court then ordered the officer to take Collins out of court, remove the chains, and turn his shirt inside out. While the court and the lawyers waited, they discussed voir dire logistics. Sometime later, the officer returned to say he'd called his supervisor for help because Collins was resisting removal of his chains and the officer "didn't want to escalate the situation by forcing his chains off." The court again delayed the proceedings for the supervisor, Sergeant Trotter, to arrive and speak with Collins. Collins then returned to court with Sergeant Trotter, who removed his chains in the court's presence. But, Collins refused to turn his shirt inside out. The court questioned Collins about his understanding of the options he had been given. The record shows no audible response from Collins beyond him repeating that he was "comfortable." The district judge then made the following record:

> At this point in time it is a quarter to three on Monday. It is very clear to me that we are going to likely get no further in the course of jury selection than identifying those who have hardships and are unable to serve and that we are very unlikely to get to any specific actual discussion/inquiry with these individuals that would impact Mr. Collins' opinion or [defense counsels'] ability to elicit Mr. Collins' opinion in the event you should return tomorrow appropriately dressed.

> However, for today, I am not going to concede the point that [the defendant has a right to appear in jail clothes] that supersedes the concern that this court has over the prejudice that would be created. . . . I am not going to have a problem with this trial before we even bring the first juror in this courtroom and I am not going [to] allow the defendant to decide how this courtroom and how this trial proceeds.

* * *

SUPREME COURT
OF
NEVADA

(O) 1947A

8

> So I will have you removed from the courtroom at this time. It's your choice because you do not wish to select one of the three options that the Court gave you, two of which would allow you to remain in the courtroom, that you are volitionally choosing to not remain in the courtroom and I am going to remove you.
>
> Tomorrow you will be given the same choice.

The officers escorted Collins out, and the court and counsel turned to administrative voir dire. Individual jury pool members whose questionnaire answers suggested hardship, exposure to pretrial publicity, or language barriers were called in individually and excused if appropriate. The remaining pool was brought in and sworn. The court admonished them that Collins had the right not to attend, which he had exercised "for today's purposes," and that they should not consider his absence "in any way." *Cf. Thomas v. State*, 94 Nev. 605, 609, 584 P.2d 674, 677 (1978) (discussing the "sound practice" of admonishing the jury in cases where a defendant appears before the jury in restraints). The court and the lawyers then introduced themselves, read the witnesses' names to the prospective jurors to flag acquaintances, and excused pool members for whom serving presented a family, medical, or employment hardship or who were ineligible to serve because of a felony conviction.

The next day, Collins returned, again in jail clothes and chains. The district court canvassed Collins about the prejudice his appearance would cause and his right to appear shackle-free, in civilian clothes. *See Estelle v. Williams*, 425 U.S. at 520-21. After consulting with defense counsel, the district court allowed Collins to stay despite his renewed refusal to allow his chains to be removed or to change clothes. *See id.* at 521 ("To be sure, an accused may knowingly, voluntarily, and intelligently

SUPREME COURT
OF
NEVADA

(O) 1947A

consent to be tried in prison garb."). On the third day and thereafter, Collins appeared without incident wearing civilian clothes and no chains.

The district court did not abuse its discretion in removing Collins from the courtroom for two hours on the first day of trial. While an accused may waive the right not to be compelled to appear before the jury in jail clothes, *id.*, that does not give a defendant who does not present a serious security threat the right to appear in court before the jury in belly chains and shackles, *see Deck*, 544 U.S. at 631, or to waste court and jurors' time by defying direct court orders calculated to preserve the dignity and effectiveness of the proceedings. *See United States v. Perkins*, 787 F.3d 1329, 1339 (11th Cir. 2015) (upholding order excluding defendant from trial who, "[d]isplaying disregard for the members of the venire who sat waiting for jury selection to begin . . . refused to get dressed for trial and refused to leave the holding cell").

With the prospective jurors waiting in the jury assembly room, the district court devoted most of the first day of trial to counseling Collins on his right to be present in civilian clothes—without shackles and cloaked in the presumption of innocence—and warning Collins that he would lose the right to be present if he did not follow the court's orders. Even though Collins finally allowed Sergeant Trotter to approach and remove his chains, Collins's removal was justified because he stubbornly refused to abide by the court's other instructions. *See United States v. Daniels*, 803 F.3d 335, 349 (7th Cir. 2015) (upholding exclusion of defendant with history of disruptive behavior who, "after being warned that he would forfeit his right to attend trial . . . refused outright to be sworn in and assure the court that his conduct would not continue during trial"); *LaGon v. State*, 778 S.E.2d 32, 41 (Ga. Ct. App. 2015) (upholding exclusion of defendant who "after

being made aware of his right to be present and that the trial will proceed forward in his absence" refused to change out of jail clothes and resisted being brought into court). Also, the district court limited Collins's removal to the end of the first day of trial, *see Foster*, 686 F.2d at 1389 n.3, during which it conducted administrative and preliminary voir dire, to which Collins had little to contribute. *See Gagnon*, 470 U.S. at 526 (declining to find a due process violation in the defendant's exclusion from a brief in-chambers voir dire and noting, in a situation in which "the defendant is not actually confronting witnesses or evidence against him," the "presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only") (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-08 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964)); *see also United States v. Greer*, 285 F.3d 158, 167-68 (2d Cir. 2002) ("holding that "routine administrative procedures," including hardship questioning, are not part of the true jury impanelment process that forms a "critical stage of the trial"). With one exception not relevant here, Collins attended the remainder of the trial, including substantive voir dire, the exercise of peremptory challenges, and trial. On this record, we do not find error amounting to an abuse of discretion, much less the structural error Collins complains occurred. *See United States v. Riddle*, 249 F.3d 529, 534-35 (6th Cir. 2001) (rejecting argument that ineffective waiver of a defendant's right to attend in-chambers portion of voir dire constituted structural error); *Manning v. State*, 131 Nev., Adv. Op. 26, 348 P.3d 1015, 1019 (2015) (reviewing district court's error in communicating with the jury outside the presence of the defendant and his counsel for harmlessness).

## III.

## A.

A witness may not give a direct opinion on the defendant's guilt or innocence in a criminal case. *See Cordova v. State*, 116 Nev. 664, 669, 6 P.3d 481, 485 (2000). The lead investigator in this case was Detective Mogg, who testified that his investigation into Brandi's death led him to arrest Collins for her murder. On appeal, Collins argues that this testimony violated the rule against a witness giving an opinion on the defendant's guilt. A district court's decision to admit or exclude evidence is reviewed on appeal under an abuse-of-discretion standard. *Ramet v. State*, 125 Nev. 195, 198, 209 P.3d 268, 269 (2009).

The district court did not abuse its discretion in allowing Mogg to testify that his investigation led to Collins's arrest. As suggested by the extra-jurisdictional case law Collins cites, the rule is that a witness "may not give a *direct* opinion on the defendant's guilt." *United States v. Kinsey*, 843 F.2d 383, 388 (9th Cir. 1988) (emphasis added), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000). This does not mean that a witness may not give testimony from which an inference of guilt—even, an inference that the witness is of the opinion the defendant is guilty—may be drawn. *See Ogden v. State*, 34 P.3d 271, 277 (Wyo. 2001) ("Testimony that is otherwise admissible will not be excluded unless it constitutes an actual conclusion about the guilt or innocence of the accused party. An interpretation of the evidence by a witness, even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt, is not in the same category as an actual conclusional statement on the guilt or innocence of the accused party.") (quoting *Saldana v. State*, 846 P.2d 604, 616 (Wyo. 1993)).

 

In one of the cases on which Collins relies, *State v. Steadman*, 855 P.2d 919, 922 (Kan. 1993), for example, the detective testified point-blank: "In my opinion [the defendant] killed [the victim]." Similarly, in *State v. Quaale*, 340 P.3d 213, 215 (Wash. 2014), another case on which Collins relies, the police officer was asked in a DUI case if he had an opinion based on the eye-movement test he administered and his "training and experience [as to] whether or not [the defendant's] ability to operate a motor vehicle was impaired?" to which the officer answered, "Absolutely. There was no doubt he was impaired." And in *Bennett v. State*, 794 P.2d 879, 882-83 (Wyo. 1990), another of Collins's cases, the detective "told the jury that in his opinion [the defendant] was a drug dealer because [the defendant] committed the three charged drug transactions."

The problem in each of these cases was not that the police officers testified to what they learned through investigation or what they did based on what they learned. It lay in the officer directly declaring to the jury that "in [his] opinion, the defendant was guilty of the crime." *Steadman*, 855 P.2d at 924. *See Bennett*, 794 P.2d at 883 ("It is difficult to see how jurors could have believed [the detective's direct statement] was anything but an opinion concerning the defendant's guilt."); *Quaale*, 340 P.3d at 217 ("Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury."). While modern law permits opinion testimony on ultimate issues, NRS 50.295; *see* Fed. R. Evid. 704, it deems a *direct* opinion on guilt in a criminal case inadmissible because it is "of no assistance to the trier of fact . . . [who is] as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." *People v.*

*Vang*, 262 P.3d 581, 587 (Cal. 2011) (internal quotations omitted); *Ogden*, 34 P.3d at 277 ("Testimony that is otherwise admissible will not be excluded unless it constitutes an actual conclusion about the guilt or innocence of the accused party."); *cf. Townsend v. State*, 103 Nev. 113, 118, 734 P.2d 705, 708 (1987) (upholding admission of expert testimony that a child had suffered sexual abuse but finding an abuse of discretion in allowing the expert to give an opinion as to the identity of the abuser, which went beyond the witness's expertise and into an area committed to jury determination).

Mogg's testimony that he arrested Collins based on the facts he learned as the lead investigator into Brandi's death stopped there. He did not offer or state a direct opinion on Collins's guilt. Doubtless, a juror might infer from Collins's arrest that Mogg believed he had enough evidence for Collins to be charged. *See Gonzales v. Thaler*, 643 F.3d 425, 431 (5th Cir. 2011) ("That the arresting officer thought he had his man is implicit in the prosecution."). But that did not amount to an opinion, direct or implied, that the jury should find Collins guilty—a determination that, as the jury was instructed, requires proof beyond a reasonable doubt. *See Commonwealth v. Luciano*, 944 N.E.2d 196, 202 (Mass. App. Ct. 2011) (rejecting argument for reversal based on investigating officer's testimony that he determined he had probable cause to arrest the defendant: "in view of the judge's thorough instructions as to the jury's function, the presumption of innocence, and the Commonwealth's obligation to prove the defendants' guilt beyond a reasonable doubt, we are confident that the jury would not have understood the officer's testimony that, at the time, he believed that the lesser probable cause standard [to arrest] had been met, as supplanting their responsibility as fact finders").

 

Course-of-investigation testimony does not give carte blanche to the introduction of unconfronted hearsay, *see United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004), or evidence concerning matters irrelevant to guilt or innocence, *see Leonard v. State*, 117 Nev. 53, 74 n.14, 17 P.3d 397, 410 n.14 (2001). Detective Mogg's testimony did not cross either line. For the most part, Mogg's course-of-investigation testimony came after that of the witnesses whose interviews he described; to the extent he alluded to facts not yet in evidence, such evidence later came in. *See also Clark County Sheriff v. Blasko*, 98 Nev. 327, 330 n.2, 647 P.2d 371, 373 n.2 (1982) (testimony explaining the reasons for police surveillance is not hearsay, because not offered for the truth of the matter asserted). Finally, the course-of-investigation testimony had relevance, since it rebutted Collins's assertion that the police did not adequately investigate the crime or other potential suspects, including Brandi's boyfriend, Rufus. *Luciano*, 944 N.E.2d at 202 (rejecting argument that the arresting officer's course-of-investigation testimony "was an impermissible comment on the defendants' guilt; it was an explanation of the officer's actions, elicited to counteract the defendants' claim from the inception of the trial that the police investigation was inadequate and misdirected"); *see United States v. Holmes*, 620 F.3d 836, 841 (8th Cir. 2010) (holding course-of-investigation evidence admissible to explain a police investigation "when the propriety of the investigation is at issue in the trial").

## B.

Collins next argues that the district court abused its discretion by refusing to instruct the jury on voluntary manslaughter. *See Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005) ("The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error.").

The district court refused to instruct the jury on voluntary manslaughter because it determined that no evidence supported the charge. The district court did not abuse its discretion in making this determination.

Our case law deems voluntary manslaughter a lesser-included offense of murder. *Williams v. State*, 99 Nev. 530, 531, 665 P.2d 260, 261 (1983).[1] For voluntary manslaughter "there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing," NRS 200.050. "The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible." NRS 200.060; *see* NRS 200.040 (manslaughter is a voluntary killing "upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible").

A defendant "is entitled to a jury instruction on a lesser-included offense as long as there is some evidence reasonably supporting it." *Rosas v. State*, 122 Nev. 1258, 1265, 147 P.3d 1101, 1106 (2006), *abrogated on other grounds by Alotaibi v. State*, 133 Nev., Adv. Op. 81, 2017 WL 5196409, at *4 (Nev. Nov. 9, 2017). But "'if the prosecution has met its burden of proof on the greater offense and there is no evidence at trial

---

[1]We apply the "elements test" from *Blockburger v. United States*, 284 U.S. 299 (1932), to determine whether an uncharged offense is a lesser-included offense of a charged offense. *Barton v. State*, 117 Nev. 686, 694, 30 P.3d 1103, 1108 (2001), *overruled on other grounds by Rosas v. State*, 122 Nev. 1258, 147 P.3d 1101 (2006). It may be questioned whether voluntary manslaughter qualifies under the elements test as a lesser-included offense of murder, given that murder does not have as one of its elements the provocation and passion voluntary manslaughter requires. But, since neither the State nor Collins raise this issue, we analyze Collins's instructional error claim under existing case law, which treats voluntary manslaughter as a lesser-included offense of murder.

tending to reduce the greater offense, an instruction on a lesser-included offense may properly be refused.'" *Id.* (quoting *Lisby v. State*, 82 Nev. 183, 188, 414 P.2d 592, 595 (1966)); *see Crawford*, 121 Nev. at 754, 121 P.3d at 589 (holding that, for the duty to instruct the jury on the State's burden to prove the absence of heat of passion upon sufficient provocation to arise, at least "some evidence" in the murder prosecution must "implicate[ ] the crime of voluntary manslaughter"). The judicially imposed condition that there be at least some evidentiary basis for the lesser-included instruction "serves a useful purpose: preventing lesser-included instructions from being misused as invitations to juries to return compromise verdicts without evidentiary support." *Rosas*, 122 Nev. at 1106, 147 P.3d at 1265.

The district court did not abuse its discretion when it determined that the record did not contain evidence to support a voluntary manslaughter charge. The autopsy and other forensic evidence, the location and condition of Brandi's body, Collins's possession of her jewelry and car, the cell phone tower evidence, and Collins's statements and conduct after the killing justified submitting the murder charges against Collins to the jury. *See* § III.C., *infra*. But the record is devoid of evidence suggesting the irresistible heat of passion or extreme provocation required for voluntary manslaughter. While the serious and highly provoking injury (or attempt) required by NRS 200.050 need not be a direct physical assault on the accused, *Roberts v. State*, 102 Nev. 170, 174, 717 P.2d 1115, 1117 (1986), neither "slight provocation nor an assault of a trivial nature will reduce a homicide from murder to manslaughter." *State v. Fisko*, 58 Nev. 65, 75, 70 P.2d 1113, 1116 (1938), *overruled on other grounds by Fox v. State*, 73 Nev. 241, 247, 316 P.2d 924, 927 (1957). Here, the only evidence of provocation and passion Collins identifies consists of his remark to a third party that

Collins thought he should delete some text messages between him and Brandi from his phone because the police might think, based on the messages, that "he had something to do with" Brandi's disappearance. The cryptic reference to a text-message exchange between a victim and her killer does not reasonably suggest serious-enough provocation by the victim or sufficient heat of passion in her killer for voluntary manslaughter.

The district court properly instructed the jury on first- and second-degree murder; the willfulness, premeditation and deliberation required by the former (absent a finding of felony murder); and the State's burden of proof. Based on those instructions, the jury returned a verdict of first-degree murder. In doing so, the jury found Collins guilty of felony murder and/or that the State proved willfulness, premeditation, and deliberation beyond a reasonable doubt. Without some evidence to support a voluntary manslaughter charge, the district court did not abuse its discretion in refusing to instruct on it and, even if it did, on this record, the error was harmless. As neither an abuse of discretion nor harmful error appears, we reject Collins's challenge to the district court's refusal to instruct on voluntary manslaughter.

C.

Last, Collins challenges the sufficiency of the evidence to support his conviction of first-degree murder and robbery.[2] The critical inquiry in deciding a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

---

[2]Collins raised a disqualification issue in his opening brief but later withdrew it. We have considered and rejected all other claims of error presented by him on this appeal.

 

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

The State charged Collins with first-degree murder on two theories: (1) that Collins's killing of Brandi was willful, deliberate, and premeditated; and/or (2) that Collins killed Brandi during the commission or attempted commission of a robbery. To prove murder, the State had to demonstrate: "(1) the fact of death, and (2) that the death occurred by criminal agency of another." *West v. State*, 119 Nev. 410, 415-16, 75 P.3d 808, 812 (2003). A specific cause of death is not required to show that the death occurred by criminal agency. *Id.* at 418, 75 P.3d at 813; *accord Middleton v. State*, 114 Nev. 1089, 1103, 968 P.2d 296, 306 (1998). And, "[c]ircumstantial evidence alone may support a judgment of conviction." *Collman v. State*, 116 Nev. 687, 711, 7 P.3d 426, 441 (2000).

Collins's argument that the evidence does not establish death due to the criminal agency of another fails. In assessing the sufficiency of corpus delicti evidence, "the court must consider and weigh all the evidence offered which bears on the question of death by criminal agency." *Middleton*, 114 Nev. at 1103, 968 P.2d at 306; *see West*, 119 Nev. at 418, 75 P.3d at 814. Here, similar to *Middleton* and *West*, the state of decomposition of Brandi's body was too far advanced to determine the exact cause of death. Even so, the ante-mortem head injuries Brandi sustained, the condition of her body and its state of partial undress, the apparent good health she enjoyed before she died, the remote location where her body was left, the theft of her jewelry, and the blood found on her car's trunk mat and in Collins's girlfriend's home provide proof sufficient to support a finding beyond a reasonable doubt that her death occurred by criminal agency.

Nor are we persuaded that the evidence was insufficient to support that Collins was the perpetrator, that the killing was willful, deliberate, and premeditated or committed in the course of—not as an afterthought to—a robbery, and that Collins robbed Brandi. A court reviewing the sufficiency of the evidence to support a criminal conviction does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (quotation omitted). Rather, it asks whether "*any* rational trier of fact" could have so found. That standard was satisfied by the evidence in this case.

We therefore affirm.

_____, J.
Pickering

We concur:

_____, J.
Douglas

_____, J.
Gibbons

